LAMAR WATER & ELECTRIC LIGHT COMPANY, *Appellant,*
v. CITY OF LAMAR.

In Banc, April 30, 1895.

1. **Taxation, Rate of:** CONSTITUTION. An annual tax, authorized by section 12, article 10, of the Missouri constitution, is not within the limitations of section 11 of that article, but may be imposed, under the conditions and restrictions of section 12, even though in excess of the rates stated in section 11. The effect and relations of these two sections are discussed. (*State ex rel. v. Columbia,* 111 Mo. 365, *overruled.*)

2. ———: ———: SPECIAL ASSESSMENTS: LOCAL IMPROVEMENTS. The "special" taxes referred to in section 11, article 10 of the constitution, do not embrace special assessments for local improvements, though the latter are based on the taxing power.

Lamar W. & E. L. Co. v. City of Lamar.

3. ——— : ——— : ———: ——— : MUNICIPAL CORPORATION. Where a city of the fourth class agrees in proper manner to pay a certain sum annually for a water supply, during a term of twenty years, the total sum that may fall due within that period is not an "indebtedness" for that sum, within the meaning of article 10, section 12 of the constitution. (*Saleno v. Neosho*, 127 Mo. 627, *followed*.)

4. Constitution : CONSTRUCTION. In construing a constitution, effect must, if possible, be given to every clause. The court will discard an interpretation which will render a clause nugatory, where another interpretation may reasonably be put upon the instrument which will give that clause some effect.

5. ——— : ———. In determining the meaning of any one word of a law, the context must be considered.

6. ——— : ———. A constitution should be construed with due regard to the existing law at the time of its adoption.

7. ———. ——— : STATUTE. In ascertaining the intention of a law, whether organic or statutory, it is always permissible to consider the consequences of any construction proposed.

8. ——— : ——— : ———. It is not to be supposed that unjust or unreasonable results are to flow from a law; so it will not be construed to accomplish such results, if its terms will permit a more beneficial reading.

9. ——— : ——— : TAXATION. In determining what constitutes the "income and revenue provided for" one year, within the meaning of section 12, article 10, of the constitution, all sources of income, including that from licenses, should be estimated.

*Appeal from Barton Circuit Court.*—HON. D. P. STRATTON, Judge.

REVERSED AND REMANDED.

The facts of the case appear in the opinion filed in the first division, May 28, 1894, upon the first hearing. After that ruling, a motion for rehearing was made, which was overruled, one of the judges dissenting. On that dissent, the cause was transferred to the court *in banc*, and there re-argued.

The decision of the court *in banc* refers for a statement of facts to the divisional opinion which was as follows:

"BLACK, C. J.—This is a suit to collect a balance of $900 due on hydrant rents for the last half of 1891, and $3,000 for the year 1892. The petition declares upon a written contract alleged to have been executed on December 31, 1890. There is the further averment that the defendant executed the contract by and through its mayor and clerk, they being duly authorized so to do, which averment is denied. The answer also raises several constitutional questions as affirmative defenses.

"The record discloses the following facts: The defendant is a city of the fourth class, having three thousand inhabitants. The board of aldermen passed an ordinance on April 21, 1890, setting forth the terms of a contract between the city, of the one part, and Messrs. Snyder and Guinney and their assigns, of the other part, for the construction and operation of waterworks by the latter. The ordinance was approved by the mayor on the twenty-second of the same month. The ordinance provides that it shall take effect from the date of its approval; that the contract therein contemplated shall be signed by the mayor and attested by the clerk, and signed by Snyder and Guinney; and that the contract shall take effect when the ordinance is ratified by a two thirds vote of the voters. An election was held on May 20, 1890, at which more than two thirds of the voters voted for the contract. Snyder and Guinney then accepted in writing the terms of the ordinance. Snyder assigned his interest in the contract to Guinney, who assigned the contract to the Lamar Water Company. That corporation and the Lamar Electric Light & Power Company were duly consolidated under the name of the present plaintiff.

"The works were constructed, and accepted by the city, and thereupon the mayor and clerk, pursuant to a resolution of the board of aldermen, and the plaintiff

signed a contract, which is dated December 31, 1890. This contract is simply a copy of the ordinance, with a statement thereto added that the ordinance is now in full force and effect. By the seventh section of the ordinance the city agrees to and does rent sixty hydrants for twenty years, to be used for the purpose of extinguishing fires and flushing gutters and sewers, and to pay therefor $50 per annum for each hydrant, payable semiannually. The plaintiff agrees to furnish the hydrants, and keep them supplied with water and to supply the inhabitants with water at specified rates. Section 10 secures to the city the right to purchase the works ten years after their completion, at their equitable value. The company has the right to mortgage the works; and, in case they are mortgaged, the hydrant rents, or so much as may be necessary, are to be set apart as net earnings, to be paid to the holders of the interest coupons on the bonds so secured. Section 19 provides: 'That for the purpose of meeting and paying the annual rental to the said A. H. Snyder and J. Guinney, their associates or assigns, by the city of Lamar, as provided in section 7 of this ordinance, there shall be levied and collected annually during the continuance of this ordinance a tax, not exceeding forty cents on the hundred dollars' valuation on all taxable property in the city, sufficient to pay said rental; if necessary. Said tax shall be levied and collected at the same time and in the same manner as are taxes for general purposes, and, when collected, the same shall be set apart for the specific purpose of paying said installments of rental as they become due, as provided in this ordinance, and shall not be appropriated to any other purpose or purposes."

"The works were mortgaged for $45,000. The value of the taxable property in the city was $745,000 for 1888, $747,015 for 1889, $716,613 for 1890, and

$890,160 for the year 1891. The city levied a general tax of fifty cents on the $100 valuation for the years 1886 to and including 1892, and for the years 1891 and 1892 it levied, in addition thereto, the water tax of forty cents. The receipts from both taxes and from licenses and all other sources, and the expenditures, were as follows: For 1890 the receipts were $8,033, and expenditures $7,903; for 1891 the receipts were $6,550, and expenditures $7,369, and for 1892 the receipts were $7,761, and the expenditures $8,339. The evidence tends to show that at the date of this contract the city had a bonded debt of $2,300. It clearly appears that in 1889 the city made a contract with the Lamar Electric Light and Power Company, whereby it agreed to pay that company annually the sum of $1,524 for a period of twenty years for electric lights.

"1. It is first objected that the ordinance is void because it was passed and approved before the proposed contract had been approved by a two thirds vote. In other words, the claim is that an election was a condition precedent to the passage of a valid ordinance.

"Section 1589, Revised Statutes, 1889, provides that the mayor and board of aldermen shall have power, by ordinance, upon a vote of two thirds of the qualified voters, to contract with any person or company, granting to such person or company the exclusive right to furnish gas, electricity or water for the city and the inhabitants for a time not exceeding twenty years.

"We find nothing in this section which gives any support to the objection. The ordinance could not take effect as a contract until ratified by the requisite vote, but it was competent, and perfectly proper, to pass the ordinance to take effect when ratified. Indeed, an ordinance setting forth the terms of the contract, and then approved by the necessary vote, and accepted in writing by the persons proposing to build the works,

was all that was necessary to make a perfect and complete contract. Section 20 of the ordinance, however, seems to contemplate a more formal contract, to be signed by the mayor for the city and by the other contracting parties. Such further formal contract was duly signed on December 31, 1890. We see no merit whatever in the objection.

"2. The further objection that the contract is void because the ordinance was not referred to the city treasurer, on the second reading, for his statement, to be indorsed thereon, that a sufficient sum of money stood to the credit of the treasury, and unappropriated, to meet the requirements of the ordinance, was also properly overruled. Sections 1623, 1629, Revised Statutes, 1889, have no application to ordinances like the one in question. They apply to ordinances which direct warrants to be issued on the treasury, or operate as warrants; but they do not apply to ordinances which are contracts, or direct contracts to be made for the performance of work or furnishing supplies in the future. When the work is done, or the supplies furnished, then an ordinance directing payment for the work or supplies should be referred to the treasurer for his certificate.

"3. It is next objected that the ordinance is void because it is in several respects in conflict with sections 11 and 12 of article 10 of the constitution. For the present we shall assume that the ordinance contemplates and requires the levy of a special tax of forty cents on the $100 valuation over and above a general tax of fifty cents on the $100, to pay the hydrant rents. With this assumption the question is whether this special levy is prohibited by said sections of the constitution. They are set out in full in the case of *State ex rel. v. Town of Columbia*, 111 Mo. 365, 20 S. W. Rep. 90, and need not be copied here.

Vol. 128—13

"In that case the town proposed, pursuant to a two thirds vote, to issue bonds for the purpose of building waterworks and an electrict light plant, and to levy and collect annually a special tax over and above the general tax of fifty cents on the $100 valuation to pay the interest on the bonds, and to create a sinking fund to pay the principal. Our conclusion in that case was that fifty cents on the $100 valuation is the highest rate that can be levied by cities and towns of more than one thousand and less than ten thousand inhabitants for any and all purposes, except for the purpose of erecting public buildings, and except for the purpose of paying indebtedness which existed at the date of the adoption of the constitution; that is to say, in 1875. It was, therefore, held that the proposed additional tax would be illegal, because in excess of the constitutional rate limit.

"That case disposes of the exact question which we now have in hand. According to the ruling then made, the ordinance in this case and the contract sued upon are utterly void in so far as they provide for the levy and collection of this special water tax of forty cents on the $100 valuation.

"But it is earnestly argued in behalf of the plaintiff here that in reaching that conclusion due consideration was not given to the last clauses of section 12. The claim now made and urged in many forms of expression is, that, under section 12, a city may, by a two thirds vote, go in debt for any purpose whatever, within its charter powers, up to five per centum of the taxable value of the property in such city; and, as the city has the right to create a debt, it has the right to levy a special tax in excess of the rates specified in section 11 to pay the debt so created. This line of reasoning is far-reaching in its consequences, for, if correct

as to cities, it is correct as to counties, school districts, and townships.

"That a city may levy a special annual tax, in excess of the annual rates specified in section 11, for public building purposes, and to pay debts existing at the adoption of the constitution, is perfectly clear; and this for the plain and simple reason that section 11 excepts from the annual rates taxes levied for such purposes. But can a city exceed the fixed highest annual rates for any purpose other than for public building and to pay indebtedness existing in 1875?

"In answering this question it must be remembered and kept constantly before the mind that we are now dealing with annual rates of taxation. Section 11 treats of maximum annual rates, and it treats of nothing else. It enters into details, and in doing so it uses plain language. This section, it will be seen, provides that the annual rates of taxation shall not exceed the stated amounts for county purposes; that they shall not exceed the stated amounts for school purposes; and that they shall not exceed the stated amounts for city and town purposes. Cities and towns having one thousand and less than ten thousand inhabitants are limited to fifty cents on the $100 valuation of the taxable property therein. Then follows the exception as to taxes levied to pay for public buildings. The section concludes with these words: 'Said restrictions as to rates shall apply to taxes of every kind and description, whether general or special, except taxes to pay valid indebtedness now existing on bonds which may be issued in renewal of such indebtedness.' It is, therefore, perfectly clear that the maximum rates specified in this section are the highest rates that cities can levy for any and all purposes, save for the two excepted purposes, as to which no rate limit is fixed.

"It is sought to break the force of this conclusion by a reference to some cases in which this court has held that local assessments, such as assessments against abutting property to pay for grading and paving streets and the like, are not special taxes within the meaning of this clause of section 11. There is a vast difference between such local assessments and a tax levied on all property for a particular purpose. The former is not a tax within the meaning of this and other clauses of the constitution, while the latter is a special tax. The distinction between the two has been so often pointed out that we do not feel called upon to open the question. According to the plain, specific and emphatic language of section 11, a city can not levy an annual tax in excess of fifty cents on the $100 valuation. This is the limit of its power for any and all purposes, save in the two excepted cases, and this water tax is not within either exception.

"We now go to section 12, and the first observation to be made is that it does not deal with maximum annual rates. It deals with and places a limit upon the debt-creating power of municipal and quasi-municipal corporations. It first provides that 'no county, city * * * shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the assent of two thirds of the voters.' Thus far this section is in perfect accord with section 11. Of this there can be no doubt. Section 12 provides further: 'Nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein. * * * *And, provided, further,* that any county, city, town, * * * incurring any indebtedness, requiring the assent of the voters as

aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for payment of the principal thereof, within twenty years from the time of contracting the same.'

"Now, the question is, do the clauses just quoted disturb the conclusion before stated as to maximum rates? What we are asked to do is to give to these clauses the force and effect of a proviso or third exception to the limits upon annual rates as those limits are set forth in section 11. Such a reading makes the exception concerning public buildings in section 11 meaningless. It cuts up by the roots and utterly eliminates the part of that section which says: 'Such restrictions as to rates shall apply to taxes of every kind and description, whether general or special.

"A further and complete answer to such a reading is that these clauses of section 12 do not profess or undertake to modify or disturb the limit to rates as laid down in section 11. It should be remembered that section 11 does not require counties, cities, and school districts to levy the rates therein specified. It only specifies annual rates beyond which they can not go. As we said in the *Columbia case*, section 11 fixes annual rates beyond which cities can not go for any purpose, except to pay for public buildings and to pay indebtedness existing when the constitution was adopted; and section 12 places a limit upon the debt creating power of municipal corporations. There is no conflict between the two sections; for how can it be said there is a conflict in these two propositions, namely: The city of Lamar shall not levy an annual tax beyond fifty cents on the $100, and this restriction includes taxes of every kind and description, whether general or special; nor shall it go in debt, even with a

two thirds vote, to an amount exceeding five per centum of the value of the taxable property therein. One restriction is as binding as the other, and we have no right to dispense with either. Full force and effect must be given to each section. We have no right to build up a supposed conflict when effect can be given to both sections, and on that supposed conflict resort to construction. The purpose and meaning of the two sections are clear, and, this being so, we have nothing to do but to give to each full force and effect. *Lake County v. Rollins*, 130 U. S. 662, 9 Sup. Ct. Rep. 651; *Barnard v. Knox County*, 105 Mo. 382, 16 S. W. Rep. 917.

"It is said the ruling made in the *Columbia case*, and now made in this case, places it out of the power of many cities to obtain waterworks. If the inhabitants actually need such works, and are willing to become private customers, and pay their proper share of the expenses, so that the city government will only be obliged to shoulder a fair part of the cost of furnishing water, we apprehend there will be no trouble in getting such works. But a complete answer to all arguments based on grounds of convenience and necessity is that, if some cities can not have waterworks, save by violating the law of the land, they must go without them. We need not repeat here what has been said on other occasions as to the general object and purpose of these constitutional restrictions, nor need we speak of the causes that led to their adoption. These are matters of common information. We adhere to the ruling made in the *Columbia case*.

"We have thus far proceeded on the assumption that section 19 of the ordinance contemplates and requires the levy of a special tax in excess of the general tax of fifty cents on the $100. That the ordinance is open to this reading seems to be conceded by the

plaintiff. But it is said the ordinance should be construed to mean a special tax of forty cents on the $100 that can be lawfully levied; in other words, the claim is that the forty cent special tax should be deemed and taken to be a part of the fifty cent tax.

"It was said in *Sheffield v. Balmer*, 52 Mo. 474, 477: 'If the contract can be performed without any violation of law, then it is only a natural and legal presumption that it will be so performed, or at least there is no legal presumption that it will not be so performed.' Where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former construction should be adopted. *Hobbs v. McLean*, 117 U. S. 567, 6 Sup. Ct. Rep. 870; *Archibald v. Thomas*, 3 Cow. 284. But when the language imports illegality, the courts should not construe it in a different sense, for that would be to make a contract for the parties which they have not made themselves. 2 Pars. on Cont. [7 Ed.], 505.

"The nineteenth section of the ordinance provides, as we have seen, 'that for the purpose of meeting and paying the annual rental' there shall 'be levied and collected annually during the continuance of this ordinance, a tax, not exceeding forty cents on the $100 valuation, sufficient to pay said rental, if necessary. Said tax shall be levied and collected at the same time and in the same manner as are taxes for general purposes, and, when collected, the same shall be set apart for the specific purpose of paying said installments of rental, as they become due, as provided in the ordinance, and shall not be appropriated to any other purpose or purposes.' The ordinance passed and approved on the same day, calling an election, provides that the ballots used in such elections shall be in the following form: 'In favor of ratifying the waterworks

contract, and levying the tax thereby provided for. Yes—No.' The city had levied a general tax of fifty cents on the $1.00—the full constitutional limit—when the contract was made for that year, and for each of the four years prior thereto. After the execution of the contract it levied the general tax of fifty cents on the $100 for each of the years 1891 and 1892, and, in addition thereto, this special tax of forty cents on the $100 valuation. This annual water contract debt and the annual electric light debt would consume the entire general levy of fifty cents.

"Now, it seems utterly unreasonable that the board of aldermen should set apart four fifths of the general tax for a period of twenty years for waterworks purposes, leaving the city nothing with which to carry on the city government, after paying the annual electric light debt, save the income from licenses and such sources. If it had been intended to pay this waterworks contract debt out of the general tax, there was no occasion for making any mention of a special tax in the ballots; and we have seen that the board of aldermen did, in point of fact, for two years, levy a special tax of forty cents in addition to the general fifty cent tax. It is perfectly clear that the city officials and the voters also understood this special forty cent tax to be a tax over and above the general tax of fifty cents. Turning now to the ordinance itself, we find it provides that the special tax shall be collected and set apart for the purpose of paying the hydrant rents, and to be used for no other purpose. Said tax shall be levied and collected at the same time and in the same manner as are taxes for general purposes. This language shows clearly enough that the special tax was to be a tax over and above any general tax which the city had the right and power to levy, and it excludes the idea that the special tax was to be a part of the general tax. We think this

contract calls for and means a special tax of forty per cent. in addition to any general tax which the city had or has the power to levy and collect. We can not fairly or justly give to it any other construction. It follows from what has been said that the agreement to levy and collect this special tax is unconstitutional, and therefore void.

"It is next insisted that, if the agreement to levy the special tax is illegal, still the agreement to pay the specified rents is valid; in other words the contention is that the manner of paying may be separated from the agreement to pay, and the agreement to pay be held valid. Much reliance is placed upon the case of *Hitchcock v. Galveston*, 96 U. S. 342.

"In that case the plaintiff agreed to grade, curb and pave certain sidewalks, and the defendant agreed to pay therefor specified prices, the work to be paid for in city bonds at par. The city compelled the plaintiffs to abandon the work after they had performed a large part of it. The plaintiff then sued to recover damages for breach of the contract. Though the city had the right to make a contract for the work, and thus bind itself for the payment of the work, it was insisted as a defense that it had no power to issue the bonds. The court held that it made no difference that the promise was to pay in a *manner* not authorized by law; that it was not a case in which payment in bonds was prohibited; that at most the issue of bonds was unauthorized because there was a defect of power; and the corporation could be held on the contract, the suit not being on the bonds. It is there conceded that the case might be different if the corporation had been expressly prohibited from doing the act by its charter or some other law, and we think the concession distinguishes that case from the one in hand, though that case differs from this in other respects.

"There is no doubt but illegal parts of a contract or statute may be disregarded when the illegal parts are severable from the other parts. But here the plaintiff agrees to furnish the hydrants with water. To pay the rents the defendants agreed to levy and collect the special tax, and set it apart for that and no other purpose. The agreement to pay by a special tax is a vital and essential part of the contract so far as the contract deals with hydrant rents.

"It has been held that, where a town has the power to contract for a supply of water for a period not exceeding ten years, a contract for twenty years can not be separated so as to be good for ten years and set aside as to the excess. *Davis v. Town of Harrison*, 46 N. J. Law, 80. That case was approved and followed by the same court in *State v. Mayor, etc., of Bayonne*, 26 Atl. Rep. (N. J.), 81.

"This method of raising the money by a special tax to pay the rents was and is an important feature of this contract, and we do not see how it can be separated from the agreement to pay. To make a severance is, in effect, to make a new contract for the parties; for the effect is to charge the general revenues of the city with the payment of this debt, which the parties agreed should be paid out of a different fund. We are of the opinion the agreement to levy and collect the prohibited tax can not be separated from the agreement to pay. The contract is, therefore, so far as it relates to the hydrant rents, void, and no action can be founded upon it.

"4. In answer to some arguments made in the briefs and on the hearing of this case, we may say that the words 'income and revenue provided for such year,' found in the first clause of section 12 of article 10 of the constitution, do not mean simply the revenue raised by a levy of tax on real and personal property. They

include also the income derived from licenses and from all other sources.

"In view of the conclusion before reached, it is not necessary to discuss the other objections to the ordinance, for it follows from what has been said that the judgment should be affirmed. Affirmed. All concur."

*Thurman & Wray, T. K. Skinker* and *R. T. Railey* for appellant.

(1) A contract to pay for a commodity to be furnished, or a service to be performed, is not a debt in the common and general acceptation of the word. It only becomes a debt when the commodity is furnished or the service performed. *Wentworth v. Whitman*, 1 Mass. 471; *Ward v. Partdrige*, 11 Mass. 488; *Weston v. Syracuse*, 17 N. Y. 112; *Garrison v. Howe*, 17 N. Y. 465; *Smith v. Dedham*, 144 Mass. 179; *Laycock v. City*, 35 La. Ann. 497; *Corpus Christi v. Woessner*, 58 Texas, 468. (2) Words used in the constitution will be presumed to have been used in their general and accepted sense. Constitutions are intended to be understood by the masses of the people who give their sanction to them, before they are binding on anyone. Cooley's Const. Lim., 68; *State ex rel. v. Laughlin*, 75 Mo. 154; *State ex rel. v. Leffingwell*, 54 Mo. 471. (3) In constructing the provisions of the constitution of Missouri, adopted in 1875, it will be presumed that its framers had an intelligent view of the wants and necessities of cities and towns authorized to be organized and maintained under it, and which organization and maintenance was expected to, and has contributed so largely to the development of the resources of the state. *State ex rel. v. Walker*, 97 Mo. 162; Constitution of Missouri, sec. 7. art. 9; Cooley on Const. Lim. [4 Ed], p. 79. The welfare of cities and

towns received careful and studious consideration at the hands of the framers of the constitution of 1875, to the end that a simple and perfect classification might be made for those organized, and to be organized, and when organized their usefulness might not be impaired, or the purpose of their organization be diverted. Const. 1875, art. 9, secs. 7, 15, 16, 17, 18; *Ibid.*, secs, 1, 6, 10. (4) The courts will not construe the provisions of the constitution so as to impair the usefulness of municipalities organized under it, unless the language is so clear that no other construction can be intelligently placed upon it. *Valparaiso v. Gardner*, 97 Ind. 1; *Clerk v. Columbus*, 23 Week. L. B. (5) The word "indebted" as used in section 12, article 10, of the constitution of Missouri, was never understood or intended to prevent cities and towns from contracting for a supply of water for the use of municipality or inhabitants thereof, for a term of years at a fixed price per annum, and such a contract does not create a debt within the meaning of said section for the amount which may ultimately become due. Such is not a debt within the meaning of the constitution. *Dively v. Cedar Falls*, 21 Iowa, 233; *Grant v. Davenport*, 36 Iowa, 401; *Territory v. Oklahoma*, 37 Pac. Rep. 1094; *State v. McCauley*, 15 Cal. 454; *Koppikus v. Com'rs*, 16 Cal. 252; *People v. Pacheco*, 27 Cal. 207; *East St. Louis v. Co.*, 98 Ill. 429; *Co. v. City*, 31 Ill. App. 339. (6) The provision in section 12, article 10, of the constitution of 1875, limiting the indebtedness of municipalities to five per cent. of the assessed valuation, is taken from the constitution of Iowa, being a part of section 3, article 11, of the constitution of Iowa, adopted in the constitution of 1846, and afterward readopted in the constitution of 1857. See 1 Charters and Constitutions (Poore), 549. The cases of *Dively v. Cedar Falls*, and *Grant v. Davenport*, construing the word "indebted" as used in the

Iowa constitution were decided in 1869 and 1872, and in adopting that provision in our constitution, we adopted the construction placed upon it by the Iowa courts. Cooley's Const. Lim. [4 Ed.], p. 64, note 2; *Valparaiso v. Gardner*, 97 Ind. 1; *Attorney v. Brunst*, 3 Wis. 790; *Skrainka v. Allen*, 76 Mo. 389; *Skouten v. Wood*, 57 Mo. 382; *Bank v. King*, 73 Mo. 591; *Law v. Blanchard*, 116 Mass. 273; *Commonwealth v. Hartnet*, 1 Gray, 450. (7) The rule of construction in relation to constitutional provisions taken from the constitution of other states, and statutory provisions taken from the statutes of other states, is the same. Cooley's Const. Lim. [4 Ed.], p. 64; *State ex rel. v. Macon Co. Ct.*, 41 Mo. 458. (8) Coupons attached to bonds given for money borrowed, though unconditional promises to pay, are not to be counted as part of the debt in determining whether the constitutional limit has been exceeded. *Durant v. Iowa County*, Wolworth, 69; *Finlayson v. Vaughn*, 54 Minn. 331; *Jones v. Hurlburt*, 13 Neb. 125. (9) The words "income and revenue" in section 12, article 10, of the constitution, comprehend all sources from which a city may lawfully collect funds for the purpose of defraying expenses of the city government; including license tax, occupation tax, fines and forfeitures; as well as the tax levied on the assessed valuation. It will be presumed that the city, before making the contract, determined its ability to pay the hydrant rental, and other necessary expenses from its annual income and revenue, which in making the contract it had the right to anticipate. *Sheidley v. Lynch*, 95 Mo. 489; *Weston v. Syracuse*, 17 N. Y. 112; *Lewis v. Water Co.*, 38 C. L. J. 178. (10) Section 19 of the contract requires the board of aldermen to levy forty cents on the $100, or so much as may be necessary, and set the same aside for the purpose of paying the hydrant rental. This must be construed to mean forty

cents of the tax that can be lawfully levied, and not forty cents in excess of what can be lawfully levied. Parties to a contract are presumed to intend that which can be done lawfully, unless by clear and unequivocal language the contrary intention is made manifest. 2 Parsons on Contracts, 497, 500, 505; Bishop on Contracts, secs. 391, 392; *Ormes v. Dauchy*, 82 N. Y. 448; *Curtis v. Gokey*, 68 N. Y. 304; *State ex rel. v. Finn*, 8 Mo. App. 350; *Lowery v. Rainwater*, 3 Mo. App. 562; *Sheffield v. Balmer*, 52 Mo. 474. (11) If it was intended by the contract to levy a tax of forty cents on the $100 in excess of the fifty cents, and such a levy was prohibited by the constitution, the contract would not be void for that reason, since that is a separate and independent covenant, and simply provides the manner of raising the money to pay the hydrant rental; if the manner provided by the contract for raising the money is unlawful, then it became the duty of respondent to provide it lawfully. This would not authorize the city to repudiate the contract, otherwise valid, especially after receiving its benefits. *Carroll v. Campbell*, 108 Mo. 550; *Hitchcock v. Galveston*, 96 U. S. 344; *Daniels v. Tearney*, 102 U. S. 415; 2 Parsons on Contracts, 800; Bishop on Contracts, 392; Field on Corp., sec. 273. (12) When a contract contains several covenants to be performed at different times, or each does not go to the entire consideration, they are independent. *Turner v. Mellier*, 59 Mo. 535; *Sawyer v. Christian*, 40 Mo. App. 295. (13) A contract, like a statute or ordinance, may be valid in part and void in part, when the valid parts are not so dependent on the void parts as to make the one essential to the other. Bishop on Cont., sec. 392; 1 Dillon on Mun. Corp. [3 Ed.], secs. 421, 422, and note 1; Cooley's Const. Lim. [4 Ed.], 215; *State v. Clark*, 54 Mo. 36; *St. Louis v. Railroad*, 89 Mo. 44; *St. Louis v. Railroad*, 14 Mo. App. 221; *Davies Co.*

*v. Dickinson,* 117 U. S. 657; *Packet Co. v. Keokuk,* 95 U. S. 80; *McPherson v. Foster,* 43 Iowa, 72; *United States v. Clark Co.,* 96 U. S. 211; *United States v. Bradley,* 10 Pet. 362; *Baker v. United States,* 109 U. S. 229; *Howell v. McAden,* 94 U. S. 463; *Williams v. New Jersey,* 130 U. S. 188; *Cole v. Shreveport,* 41 La. Ann. 845-6; *Oubre v. Town of Donaldsonville,* 33 La. Ann. 389-90; *Corcoran v. Coal Co.,* 28 N. E. Rep. 259; 1 Beach Pub. Corp., 707. (14) The people of the city of Lamar had a right, by a vote of two thirds majority to authorize a levy of forty cents on the $100 under section 12, in excess of the fifty cents provided for in section 11 of article 10 of the constitution of 1875, and the opinion in the *Columbia case,* 111 Mo., ought not to stand as the law construing section 12 of the constitution. Reviewed by Judge KELLY, 35 C. L. J., 342. Reviewed by Judge MARTIN, 35 C. L. J., 227. (15) The limitation in section 11 of article 10 of the constitution does not apply to all special taxes authorized to be collected by cities and towns under the constitution and statutes of Missouri. *Farrar v. St. Louis,* 80 Mo. 386; *Thomas v. Company,* 22 Mo. App. 8.

*John B. Cole* and *H. C. Timmonds* for respondent.

(1) Bill number 99 was passed without any vote of the people being first had, and without authority of law, and is, therefore, void. Constitution, art. 10, secs. 11, 12; R. S., sec. 1589. (2) Bill number 99 contemplated the payment of money and the indorsement of the treasurer as provided by Revised Statutes, 1889, section 1623, was essential. (3) No valid contract in writing was entered into between plaintiff and defendant. R. S. 1889, sec. 3157; *Heidelberg v. County,* 100 Mo. 70; *Crutchfield v. Warrensburg,* 30 Mo. App. 456; *Furniture Co. v. District,* 51 Mo. App. 549; Dillon on

Municipal Corp. secs. 371, 372, 373. The contract, if there is one, provides for a special water tax in addition to the tax of fifty cents for general city purposes and in excess of the constitutional limit of the tax for city purposes. Constitution, art. 10, sec. 11; *State ex rel. v. Columbia*, 111 Mo. 365; *Barnard v. Knox County*, 105 Mo. 382; *Black v. McGonigle*, 103 Mo. 193; *Arnold v. Hawkins*, 95 Mo. 569; *Book v. Earl*, 87 Mo. 246; *Water Works v. City*, 21 S. W. Rep. 393. (4) By the contract, if there is one, the city became indebted in the year 1890 for the year 1891, and for each of the nineteen years next succeeding, to an amount exceeding the income and revenue provided for that year, or for any succeeding year, and to an amount exceeding any income and revenue which might lawfully be provided. It is, therefore, void. Constitution, art. 10, sec. 12; *Book v. Earl*, 87 Mo. 246; *Barnard v. Knox County*, 105 Mo. 383; *Black v. McGonigle*, 103 Mo. 192; *Gas Co. v. Buckwedel*, 62 Cal. 642; *Dively v. City*, 27 Iowa, 233; *Water Co. v. City*, 59 Mich. 311; *Putnam v. Grand Rapids*, 58 Mich. 416; *County v. City*, 80 Wis. 358; *Davenport v. Kleinschmidt*, 16 Am. and Eng. Corp. Cases, 301. (5) The contract sued on was in violation of both the prohibitory clauses of section 12 of the constitution, the one limiting the annual indebtedness to the income and revenue provided for such year, and the other limiting the aggregate amount of indebtedness to five per centum of the taxable property in the city. Constitution, art. 10, sec. 12; *Water Co. v. Woodward*, 49 Iowa, 62; *French v. Burlington*, 42 Iowa, 614; *Prince v. Quincy*, 128 Ill. 433, and 105 Ill. 138; *Lake County v. Rollins*, 130 U. S. 662; 2 Beach on Public Corporations, sec. 810. (6) A void part of a municipal contract can not be regarded as a separate part, for no one can say that it was not an influential factor in causing the execution of the contract. *State v. Board, etc.*, 26 Atl.

Rep. 92; *State v. Mayor*, 26 Atl. Rep. 81; *Davis v. Town*, 46 N. J. Law, 79; *Hamilton v. Thrall*, 7 Neb. 310; *Reinman v. Railroad*, 7 Neb. 310; *Gould v. City*, 4 S. W. Rep. 650. The contract being void, the plaintiff can not recover on a *quantum meruit*, and there is no estoppel or ratification nor any liability for damages. *Wolcott v. Co.*, 26 Mo. 26; *Johnson v. School District*, 67 Mo. 319; *Rumsey Mfg. Co. v. Schell City*, 21 Mo. App. 175; *Sturgeon v. Hampton*, 88 Mo. 203; *Prince v. Quincy*, 128 Ill. 457; *Dixon v. Field*, 111 U. S. 190; *Austin v. Coggshall*, 12 R. I. 329.

BARCLAY, J.—It becomes necessary for the court *in banc* to decide, for the first time, whether the limitations to taxation, imposed by section 11 of article 10 of the Missouri constitution, apply to a tax levied under section 12 of that article, in a city of the fourth class, for the purpose of supplying the city with water.

It will not be needful to recite the facts out of which the case arose. They have been already given in the opinion filed while the cause was in the first division (26 S. W. Rep. 1025), which will be published in the official report of the case.

1. The annual tax was held void in that opinion because adjudged by the court to be in excess of the rate permitted by section 11.

That ruling presents the first point for determination. Its importance is great; and the effect of any action upon it will be far reaching. The whole court must attempt to solve the same problem which was discussed before the first division in the *Columbia case* (1892, 111 Mo. 365, 20 S. W. Rep. 236), and later before the court *in banc* in the *State ex rel. v. Seibert* (1893, 116 Mo. 415, 22 S. W. Rep. 732). But in the latter case it was found that a decision could be reached

VOL. 128—14

without meeting the difficulties which now confront us.

We have given the subject patient consideration. The writer has become convinced that an endeavor to practically apply the rule announced in the *Columbia case* will produce results which can not have been intended by the constitution, or by its authors. Hence he has felt obliged to recede from the position which his concurrence in the *Columbia* judgment indicated. In that case (111 Mo. 374-6) the provisions of sections 11 and 12 of article 10 are copied at length. So they need not be repeated here.

The real difficulty in the way of that construction is developed by an attempt to keep those sections in harmony, when so construed.

Each of the sections is entitled to receive the same respect and obedience. Neither can be wiped out for the sake of enforcing a supposed wiser policy embodied in the other.

Our duty is only to construe the law; and all parts of the constitution are of equal moment and are equally binding upon us, as upon all other citizens of the state.

Before attempting to define our views as to the bearing of these sections on each other, let us, as briefly as possible, examine the practical consequences of attempting to maintain the construction put upon them in the *Columbia* litigation.

In endeavoring to arrive at the probable intention of a public enactment, whether it be organic or of lesser rank, it is always permissible to consider the consequences of any construction proposed to be given to it. Such consequences have a most important bearing in aid of the interpretation of any law. For it is not to be supposed that any unjust or unreasonable results were intended to flow from the law. Hence a construction which permits such results will not be accepted by judicial interpreters, where the language is susceptible

of a more beneficial reading. Rutherforth's Inst. [2 Am. Ed.], p. 414.

The inevitable implication in the ruling in the *Columbia case* is that the provisions of section 12 for the levy of an annual tax (in the instances therein permitted) are intended to be operative within the limitations of section 11, and not otherwise. It is not, and could not be, denied that a tax may be imposed under section 12. The terms of that section are too clear on that subject to admit of question. The only doubt, or point of controversy, is whether the true intent of the constitution should be held to sanction such a tax in excess of the rate prescribed in section 11, or whether that tax must be levied within the range of rates stated in section 11.

In seeking to discern the intent of these provisions, let us begin by examining the workings of the legal machinery along the lines defined in the *Columbia* suit.

Section 11 prescribes a limitation of the maximum annual tax rate (as to cities of the size of Lamar) at fifty cents on the $100 valuation of taxable property.

So that the imposition of an annual tax under section 12 (if only capable of enforcement within the restrictions of section 11) might be held (under the Columbia ruling) to produce either one of two possible results. These we shall, for convenience of treatment, designate as alternatives *a* and *b*. We will consider each of them separately.

*a.* The annual tax, levied under section 12, might be held to be a fixed charge upon the local revenue, raised by the annual levy of fifty cents on the $100. So that the fund available for ordinary governmental purposes would be reduced accordingly, and would then be merely what remained after applying the tax under section 12 to its designated purpose.

If that theory prevailed, an annual tax of that sort, to the limit of fifty cents on the $100, could be imposed by vote in some cities (without going beyond the five per centum of taxable value), leaving nothing for the usual and necessary expenses of the local government. And a corresponding reduction of annual revenue, available for the ordinary wants of the city, would follow any and every vote of indebtedness under section 12. In other words, taxes might be levied under the latter section, to meet, for example, a valid bonded indebtedness, to such an amount as to render the remainder of the annual rate (allowed by section 11) wholly inadequate to the needs of the city government.

The same thing could occur in a similar way in a county under these sections.

Yet these municipalities are agencies of the state government, and their maintenance is needed for the performance of many other functions besides the payment of debts.

The serious question which arises, upon this view of the rule in the *Columbia case*, is whether it is a reasonable construction of these constitutional provisions to hold that the people of these localities are authorized, by a vote under section 12, to divert to some special object, for a period of twenty years, all, or such part as they please, of the general revenue raised under the rates in section 11, and imperatively needed for the support of the local autonomy.

Yet that consequence would be possible under the ruling that an annual tax under section 12 is a specific charge against the general revenue, within the limitations of section 11.

If that view, however, seems unreasonable, let us turn to the other alternative.

*b.* The second alternative, under the *Columbia* ruling, would be to hold that, as section 11 plainly con-

templates the imposition of the taxes (mentioned therein) to meet the vital needs of government, the annual revenue must first be devoted to those needs, leaving any residue that might remain, from the pre-scribed annual levy, to be applied to the purpose desig-nated by any tax levied by authority of section 12.

Of course, such a holding would reduce the sup-posed annual tax under section 12 to the consistency of a shadow.    There would be nothing of substance in it. The local authorities could, at any time, by a slight enlargement of the ordinary allowances for the support of their government, cut down to zero·the residuum of the annual rates of section 11.    Even if they always acted in entire good faith, the probability of increasing demands upon the local revenue, during the changes of conditions in a period of twenty years, would render any dependence upon a surplus from the annual rate highly illusory.

Certainly no bonded indebtedness in these days could be founded on such a shifting sand of credit as a tax would be under section 12, so construed.    What creditor could be found who would loan funds to a municipality on such a basis?

That construction of the organic law would practi-cally eliminate the grant of power to incur an indebted-ness (except for public buildings), under the provisions of section 12.    Its adoption would, in effect, give the latter section another proviso, namely, "provided such annual tax shall only be payable from any surplus of the annual rates, prescribed in section 11, that may remain after the ordinary demands of the local govern-ment are met, each year."

How such a reading of the fundamental law would depart from its reasonable and natural purport, as it is now written, can be seen at a glance by any reader who will compare the closing lines of section 12 with

the supposed proviso above, which attempts to express the second alternative construction possible under the *Columbia case.*

After the best consideration we have been able to give to that decision, we can not escape the impression that one of two results must necessarily follow from it; either the general revenue of the locality may be, in great part, or wholly, absorbed for twenty years, and diverted from the maintenance of the government by the effect of an annual tax under section 12; or, on the other hand, if the absolute needs of the local government are entitled to priority of payment from the authorized revenue under section 11, then any so-called "tax" imposed under section 12 must depend wholly on the flimsy contingency whether or not any surplus remains from the regular rates after the ordinary expenses of the city, etc., have been satisfied.

Such a "tax" would be in reality no tax. It certainly would not be a "tax sufficient to pay" the indebtedness incurred, as section 12 demands. It would be a mere contingent charge against the unexpended portion of the general revenue of each year. It might never "pay" the indebtedness; and its struggle for any sort of existence would be against great odds.

So far, we have attempted to estimate the practical effects of giving section 12 play within the limitations of section 11, as required by the *Columbia case.* We now ask whether either of the alternative constructions above indicated can be accepted as a reasonable and true interpretation of the meaning of the constitution?

2. Or may not another alternative construction have been intended, one not sanctioned by the judgment in the *Columbia case,* however? That is to say, may it not have been intended that the "annual tax," authorized to be imposed, upon a vote, under section 12,

should be levied and collected (within the limitations of that section), in addition to the annual rates for local purposes permitted (without any vote) by section 11?

If that view were taken, no such consequences as have been pointed out could follow; there would be no clash between the sections, no struggle to be settled as to which of them is of paramount authority.

Section 12 could then be regarded as a proviso to section 11, and any tax duly levied to meet a voted indebtedness would have a solid foundation on the taxable resources of the locality. Yet on the other side, the possibility of depriving the municipality of means to sustain its government would disappear.

By that construction alone, it seems to us, can both of these sections be given full force.

The apparent obstacle to this construction is that part of section 11 which declares that "said restrictions as to rates shall apply to taxes of every kind and description, whether general or special," with certain exceptions as to existing indebtedness and renewals thereof.

That provision has created the difficulty in dealing with these sections. The argument in favor of the *Columbia* ruling is based upon it. That argument is that a tax under section 12 is a "special" tax, within the meaning of section 11, and hence within its restrictions.

The tax authorized by section 12 is not therein called a "special" tax, but an "annual tax." Mere names, however, are of slight weight in such an investigation. The real inquiry should be whether a tax imposed under section 12 can, upon due consideration of the practical ends in view in these sections, be held to be included by the term "special" tax in section 11, within the intent of the constitution.

We think not; first of all, because of the singularly unreasonable consequences (already indicated) which would then be possible.

3. Furthermore, the general design and aim of sections 11 and 12 support the assumption that the restrictions of the former as to "special" taxes were not intended to nullify the grant of power as to annual taxes authorized by section 12 to be imposed after a vote of the people.

The two sections are component parts of a system of financiering which experience pointed out as furnishing a safer course than had been previously followed.

Two great objects were in view, and each of the sections treats of one of them.

One object was to limit the rates of taxation for raising the annual revenue required for local purposes; the other, to limit the power to incur indebtedness beyond the annual income and revenue provided for any one year.

Section 11 deals with rates of taxation for annual revenue which may be applied by the local authorities to meet "the ordinary and current expenses" of the local goverment. *Book v. Earl* (1885), 87 Mo. 252. (Compare Const. 1875, art. 9, sec. 19.)

Section 12 deals with the subject of indebtedness, its limitations, and the ways and means to meet it when assumed.

All through section 11, "annual rates" of taxation are mentioned, and the limitations are upon those rates. In the opening lines of section 12 appears a prohibition of indebtedness "for any purpose, to an amount exceeding in any year the income and revenue provided for such year," without the assent of two thirds of the voters, etc.

The rates of annual taxes sanctioned by section 11 are the chief source of the revenue thus mentioned. If it had been the intention that the restrictions of section 11 as to rates of taxation should apply also to taxes to meet indebtedness, then section 12 should certainly have ended at the word "jail."

To authorize the creation of indebtedness would then have been quite enough.

If the only resource for payment of such indebtedness is the revenue already allowed by the rates prescribed in section 11, what need was there to go further and authorize by the last lines of section 12 another tax levy which could only be operative within the limits of section 11. Taxes up to those limits could be levied annually under section 11, without the ceremony— rather say, farce—of levying an annual tax under the power given by section 12, which, we are told, conferred in reality no more power than already existed under section 11.

If the municipality was authorized to, and did, incur an indebtedness under the power contained in the first half of section 12, the obligation would necessarily be a charge against its revenues. Then why give further power, as is done by the second proviso of section 12, to levy any annual tax to meet such indebtedness, if all the tax that could be levied was already sanctioned by section 11?

If the view expressed in the *Columbia case* is sound, all of the latter proviso in section 12 (except, perhaps, as to the limit of twenty years to terms of indebtedness) could be absolutely stricken out without affecting the meaning of the constitution in the slightest particular. Certainly all that part of it which authorizes, or rather commands, the levy of an "annual tax" would be wholly worthless and null.

But we are not authorized to adopt a construction

which substantially discards a clause of such a document, if another reasonable interpretation can be stated which will give effect to that clause.

The principle of interpretation on that point is familiar, and we state it in the words of Judge COOLEY.

"The rule applicable here is, that *effect is to be given, if possible, to the whole instrument,* and to every section and clause. If different portions seem to conflict, the court must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory." Cooley's Const. Lim. [6 Ed.], 1890, p. 72.

If the word "special," near the close of section 11, be held to apply to any special taxes that might be levied for use under the "cash system" which the constitution establishes, but not to apply to taxes expressly authorized, by the very next section, to meet indebtedness beyond the revenue, available on the cash basis for each year, then the last proviso of section 12, permitting an annual tax to pay a voted indebtedness, would have full vigor and effect; otherwise it can not have any force whatever.

It is therefore our duty to construe the word in that manner, under the rule defined by Judge COOLEY, to save that proviso of section 12 from annihilation by construction.

4. The supreme court has definitely held that the term "special taxes," used in section 11, does not include special assessments for street improvements, although the ruling concedes that those assessments are sustainable only as an exercise of the taxing power. *Farrar v. St. Louis* (1883), 80 Mo. 379.

That decision tends to sustain the opinion that the special taxes referred to in section 11 are only such as come within the general purview of that section.

The context must always be kept in view in determining the meaning of any one word of an enactment. That is a general, and very useful, canon of interpretation.

We should not, moreover, lose sight of the fact that, at the time the constitution was framed, certain special taxes were leviable in the counties, in addition to the general levies allowed. We recall, at this time, the road tax (2 Wag. Stat., 1872, p. 1225, sec. 38), and the poorhouse tax (2 Wag. Stat., 1872, p. 998, secs. 8–12). There may have been others.

These taxes might have been imposed at any time by the county authorities along with the general levies.

The limit of taxation for ordinary county purposes (except in St. Louis) was fifty cents on the $100 valuation when the constitution was in preparation (2 Wag. Stat. 1872, p. 1193, sec. 165). Under the statute of 1865, that limit was eighty cents (Gen. Stat. 1865, p. 121, sec. 76), and the laws of 1855 fixed it at forty cents (R. S. 1855, p. 1349, sec. 1). It was well known to the people of the state that the limit of fifty cents, in force in 1875, was barely sufficient in many counties to meet the annual requirements.

Bearing these facts in mind, what should be held to be the fair and intended scope of the terms ''general and special'' taxes, with reference to the restrictions of section 11? Were they not intended to include all taxes for raising current revenue in the specified municipalities, as distinguished from taxes expressly authorized (by the next section) to meet indebtedness?

5. Section 11 in no manner deals with future indebtedness, or (in express terms) with taxes to meet it. It refers to taxes to pay existing indebtedness, but only in order to declare that they are not within the scope of the section or of its restrictions. That remark as to existing indebtedness is in the nature of an exception

to the limitations of section 11.   And how much more clearly is such an exception expressed by the plain language of section 12 (which immediately .follows) as to taxes imposed thereafter upon a vote of the people on incurring new indebtedness authorized by the constitution itself?

The provisions of section 12 on that point are designed to . regulate a particular topic, namely, the laying of a "sufficient" annual tax to meet indebtedness duly incurred for certain governmental purposes, upon the requisite vote.   These definite and special provisions treat of one phase only of the general subject of taxation, and their situation in the organic law indicates the intent to take them out of the general declarations as to rates in section 11.   Otherwise, as we have shown, these provisions of section 12 had better in fact be stricken out of the fundamental law, for they will have utterly perished by construction.

6.   View the subject as we may, the restrictions on rates in section 11 can not be applied to an annual tax authorized by section 12, without reaching results which will cancel from the organic law the second proviso of the latter section.

That must be the inevitable effect of following and attempting to apply the *Columbia* ruling.

It appears impossible to give that ruling effect without becoming involved in difficulties the solution of which will require the interpreter to discard some part of one or the other of these sections of the organic law to reach any sort of consistent construction.

It seems first of all necessary that the funds, permitted by section 11 to be raised, for the legitimate, ordinary purposes of the government, should be preserved from invasion or diminution by any tax levied under section 12.   Experience demonstrates that the limitations of section 11 are narrow enough even as

applied to the general needs of the municipalities which that section governs.    The provisions of section 12 were not designed to cut down the annual revenue intended for the ordinary wants of the local governments.    But such a cutting down would be imperative, if the first alternative ruling, already discussed, were adopted.

On the other hand, the terms of section 12 are not so drawn as to permit the conclusion that the tax levied under them was intended to be any such myth as it would be if it depended only on a surplus remaining, each year, from the rates levied under section 11.

The only escape from these results is in the reading of those sections which we have above attempted to justify, namely:    That the tax expressly authorized in the last lines of section 12 may be imposed in excess of the rates named in section 11, if the other limitations in section 12 are observed.

7.    We believe also that a due consideration of the exceptions to the rate limitations of section 11 and of the exceptions in section 12 will tend to show that section 12 was never designed to be operative merely within the limits as to rates defined in section 11.

But we do not regard that point as requiring further development at this time, in view of the other reasons that support our conclusion.

8.    We believe that conclusion gives proper and full effect to the views on this topic announced by many of the learned members of the constitutional convention of 1875 during its sessions; and it is in accord with the construction which the members of the general assembly appear to have adopted in various enactments in regard to revenue.

The learned trial judge, who decided the *Columbia case* on the circuit, felt bound, no doubt, to give much weight to some remarks in *Barnard v. Knox County* (1891), 105 Mo. 382, which seemed to point toward the

result reached in the *Columbia* judgment. But in the *Knox County case* those remarks were unnecessary, and can not be considered to have authoritative force.

Our judgment is that the ruling in the *Columbia case* should no longer be followed, and that we should adopt a position which will recognize the force of all parts of sections 11 and 12.

No doubt the *Columbia* ruling might better express the constitutional commands as we would wish they were written, and the learned judge who delivered it has given the best reasons that can be assigned to sustain it; but we think the ruling appears faulty when practically applied, and that it will not bear the tests of time and trial.

9. If the case is to be governed by the terms of section 12, the question then arises whether the limitations of that section have been exceeded.

On that point there is some conflict in the precedents from other states; but the correct rule, we think, has been well stated by Judge DILLON in the latest edition of his work on Municipal Corporations, viz:

"Under the constitutional provisions in Iowa, Illinois, Indiana and Pennsylvania, referred to, it is held that a corporation may make a contract (at least for necessaries) covering a series of years, upon which an obligation to pay may arise from year to year as the thing contracted for is furnished, and in such case, *the whole amount* which may ultimately become due *does not constitute a debt* within the constitutional prohibition. But in order to ascertain whether the corporation by such contract is transgressing the limit, regard is had only to the amount which may fall due within a certain year or other period; and if the revenues for that year or other period are sufficient, over and above the payment of the other expenses, to pay such amount, there is no debt incurred within the constitutional pro-

hibition." 1 Dillon's Municipal Corporations [4 Ed.], 1890, sec. 136a.

The term "indebtedness" is a wide one, and must be construed in every case in accord with its context.

It has been very recently considered, in its application to the subject in hand, by the court *in banc*, and the conclusion was announced that such an obligation to pay an agreed sum, year by year, for the furnishing of certain necessary supplies during a term of twenty years, was not an immediate indebtedness for the entire amount that might ultimately become due by installments during that term.

There is no occasion to enter into an original discussion of the reasons for that conclusion, since they have been already given in the opinion of the court *in banc* in *Saleno v. Neosho* (1895), 127 Mo. 627 (30 S. W. Rep. 190).

Following that decision we hold that the indebtedness created by the Lamar ordinance did not pass beyond the limits as to amount prescribed by section 12.

10. On the remaining point, as to the meaning of "income and revenue provided for such year," in section 12, we coincide with the view indicated in the divisional opinion in the present case.

It follows that the judgment should be reversed and the cause remanded. It is so ordered.

GANTT, SHERWOOD and ROBINSON, JJ., concur in this opinion.

BRACE, C. J., and MACFARLANE and BURGESS, JJ., dissent from the first, second, third, fourth, fifth, sixth, seventh and eighth paragraphs, and concur in the views expressed in the opinion delivered in this cause by Chief Justice BLACK in the first division.