[S. F. No. 10503.   In Bank.—August 12, 1924.]

## EDITH STEGE, etc., et al., Appellants, v. CITY OF RICHMOND, etc., et al., Respondents.

[1] MUNICIPAL CORPORATIONS — CHARTERS — MUNICIPAL AFFAIRS—CONSTITUTIONAL LAW.—Prior to the amendment of section 6 of article XI of the constitution in 1914 and after its amendment in 1896, a charter framed and adopted under the authority of the constitution was subject to and controlled by general laws except in municipal affairs; and in accordance with the construction placed upon the amendment of 1896, it was necessary to enumerate in such a charter or in an amendment thereto the specific powers which the city might exercise in relation to municipal affairs in

1.   See 18 Cal. Jur. 778, 782.

order to remove the city in its control of such affairs from the operation of general laws.

[2] Id.—1914 Amendment of Sections 6 and 8 of Article XI of Constitution—Purpose of.—One of the purposes of the amendments in 1914 of sections 6 and 8 of article XI of the constitution was to obviate the necessity of specifically enumerating in the charter all powers relating to municipal affairs in order to remove the city as to such matters from the operation of general laws.

[3] Id.—City not Availing Itself of Right Conferred by Amendment—Status of.—A city having failed to avail itself of the right conferred by the amendment in 1914 of sections 6 and 8 of article XI of the constitution, such city is in the same situation as it was prior to that amendment; in other words, if it had authority to proceed under the Improvement Bond Act of 1915 (Stats. 1915, p. 1464) in street proceedings prior to 1914, it still has that power.

[4] Id. — Improvement of Streets — Municipal Affair. — The improvement of streets within a municipality is a municipal affair.

[5] Street Law — City of Richmond — Improvement Act of 1911 — Improvement Bond Act of 1915.—The city of Richmond not having availed itself of the right to come within the terms of the amendments in 1914 of sections 6 and 8 of article XI of the constitution, and its charter, which was adopted in 1909, having provided that the city is granted the power to "exercise such other powers as may be hereafter granted by the legislature to municipalities within the state," and the Improvement Bond Act of 1915 having authorized any municipality in the state to determine that serial bonds shall be issued in the manner therein provided to represent assessments for street work levied under the Improvement Act of 1911, the city had the right to proceed, and did properly proceed, in the issuance of serial bonds under the Improvement Bond Act of 1915 to represent assessments for street work done under the Improvement Act of 1911, the resolution of intention to do the work having been adopted under the provisions of said acts.

[6] Id. — Character of Obligation Imposed by Bonds — Construction of Improvement Act of 1915. — The omission from the amendment of 1917 of section 6 of the Improvement Act of 1915 of the clause, "and neither the municipality nor any officer thereof is to be holden for payment" which clause was contained in the section before said amendment, did not make the bonds a general

2.  See 18 Cal. Jur. 783.
4.  See 18 Cal. Jur. 787.

obligation of the city, the bonds being still "payable exclusively from said fund" (the redemption fund created by the act).

[7] ID.—RESOLUTION OF INTENTION—OBJECTIONS—JURISDICTION.—Certain property owners having objected to the time of maturity of serial bonds to be issued to represent assessments for street work to be done under the Improvement Act of 1911, which objections were sustained, and thereafter a second resolution of intention having been passed to do the work, to which no protests or objections were interposed, the city council acquired jurisdiction to order the work performed, and it is idle for such property owners after the performance of the work to contend, having obtained the result which they sought, that the council should have made a formal order granting or denying their objections.

[8] ID.—DEFAULT IN PAYMENT OF BONDS—UNAUTHORIZED METHOD OF SALE OF PROPERTY—CITY OF RICHMOND.—The method provided by the city of Richmond for the sale of property to satisfy unpaid taxes for municipal purposes having contemplated that the same be separately advertised and sold, and section 12 of the Improvement Act of 1911 having declared that upon default in payment of bonds representing street assessments the lands securing such assessments shall be sold in the same manner in which real property in such city is sold for the nonpayment of general municipal taxes, the method of grouping lots and selling each lot in a particular group to satisfy the street assessment lien on each of the other lots in the same group was unauthorized.

[9] ID.—IMPROVEMENT BOND ACT OF 1915—CONSTITUTIONAL LAW.—The Improvement Bond Act of 1915, prescribing the form of the bond and in specifying the manner of its payment, does not violate the provisions of section 31 of article IV of the constitution prohibiting the legislature from pledging the credit of any city in the state.

[10] ID.—TAXATION — ORDINANCES — CONSTITUTIONAL LAW.—A tax ordinance of the city of Richmond to the effect that property when sold shall be sold to the city is not in contravention of section 31 of article IV of the constitution as constituting a gift to the bondholder, the improvement of streets being for a public purpose.

[11] ID.—QUIETING TITLE—ACCEPTANCE OF BENEFITS—INVALID SALE—PAYMENT OF ASSESSMENTS—EQUITY.—Even though a sale of property to satisfy the liens of street assessments is invalid, a court of equity will not grant to the property owners a decree quieting their title against the burden of the assessments without their paying or offering to pay their just portion of the cost of the improvements, where the city council had jurisdiction to order the work performed, all the proceedings leading up to and includ-

10. See 18 **Cal. Jur.** 807.

ing the issuance of bonds are valid, and the property in question has been benefited by the improvements and the expenditure incident thereto.

(1) 28 **Cyc.**, p. 274.　(2) 28 **Cyc.**, p. 274.　(3) 28 **Cyc.**, pp. 274, 972 (1926 Anno.).　(4) 28 **Cyc.**, p. 946.　(5) 28 **Cyc.**, p. 972 (1926 Anno.).　(6) 28 **Cyc.**, p. 1644.　(7) 28 **Cyc.**, p. 992 (1926 Anno.).　(8) 28 **Cyc.**, p. 1244.　(9) 28 **Cyc.**, p. 1533.　(10) 28 **Cyc.**, p. 1535.　(11) 28 **Cyc.**, p. 1246.

APPEAL from a judgment of the Superior Court of Contra Costa County.　A. B. McKenzie, Judge.　Affirmed.

The facts are stated in the opinion of the court.

R. M. F. Soto for Appellants.

D. J. Hall and Kirkbride & Gordon for Respondents.

SHENK, J.—This is an action to quiet title. From a judgment in favor of the defendants the plaintiffs appeal. The appellants are the owners of certain lots in the city of Richmond. The respondents claim an interest in said lots by reason of certain assessments for street improvements. On the twenty-first day of August, 1916, the council of the city of Richmond adopted a resolution, number 281–2, declaring its intention to grade, curb, sidewalk, and pave certain portions of 47th Street in said city. The proceedings were taken under the Improvement Act of 1911 (Stats. 1911, p. 730) and amendments thereto (Stats. 1915, p. 1464), and the Improvement Bond Act of 1915 (Stats. 1915, p. 1441) and amendments thereto (Stats. 1917, p. 142). Said resolution of intention contained, among other things, a provision for the issuance of serial bonds to represent the assessments, the same to mature in five years, and gave notice of the time and place for hearing objections to said improvements. In due time the appellants signed and filed with the city clerk a document protesting and objecting to the proposed improvement proceedings in this: That at a prior meeting of the council when said proposed improvements were considered it had been agreed that the work should be carried out as proposed, but that the serial bonds to represent the assessments should mature in nine years; that because of the fact that the objectors were large property owners in

the district, they would be unable to pay their assessments within the five-year period. The communication concluded as follows: "Wherefore the undersigned pray that this honorable body correct and amend its resolution of intention or republish the same so as to provide that the bonds under which the work is to be paid for shall mature nine years from and after a date to be fixed by your honorable body." This document was presented to the council and during a consideration thereof appellant W. C. Dohrman appeared and stated that the protestants had no objection to the proposed work, but that they did object to the term of the bonds. The council thereupon rescinded said resolution, abandoned all proceedings taken thereunder and immediately adopted a resolution of intention to perform said work, number 281-3, in all respects the same in form as resolution number 281-2, except that in the second resolution it was provided that the bonds to be issued to represent the assessments should mature in nine years as requested by appellants. Thereafter proceedings were taken pursuant to the second resolution of intention, the contract was let, the work was performed and accepted, the assessments were levied to pay the cost and expenses of the work and bonds were issued to represent the assessments levied on the lands of the appellants. For delinquency in the payment of certain installments of said bonds and accrued interest the said property was sold to satisfy said assessments. No protests or objections were interposed by the appellants, or any of them, at any stage of the proceedings under the second resolution of intention until after the sale for delinquency, when this action was brought.

The complaint is in the ordinary form of a suit to quiet title and the purpose of the action is to relieve said property from the burden of the assessment by a decree in this proceeding. The purpose is apparent from a stipulation made at the trial that the validity of the proceedings taken under the street improvement laws and resulting in said assessments was the only matter in dispute and that whatever interest the city might have in said land by reason of taxes levied for general municipal purposes was not involved herein.

1. It is first insisted that the Improvement Bond Act of 1915 was not available to the city of Richmond by reason

of the amendment in 1914 of sections 6 and 8 of article XI
of the constitution. [1] Prior to the amendment of sec-
tion 6 in 1914 and after its amendment in 1896 a charter
framed and adopted under the authority of the constitution
was subject to and controlled by general laws except in
municipal affairs. In accordance with the construction
placed upon the amendment of 1896, especially in *Fragley*
v. *Phelan,* 126 Cal. 383 [58 Pac. 923], and subsequent cases
(see *Clouse* v. *City of San Diego,* 159 Cal. 434 [114 Pac.
573]), it was deemed necessary to enumerate in such a char-
ter or in an amendment thereto the specific powers which
the city might exercise in relation to municipal affairs in
order to remove the city in its control of such affairs from
the operation of general laws. That portion of the amend-
ment of 1914 material to this contention reads: "Cities and
towns hereafter organized under charters framed and
adopted by authority of this constitution are hereby em-
powered, and cities and towns heretofore organized by the
authority of this constitution may amend their charters
in the manner authorized by this constitution so as to be-
come likewise empowered hereunder, to make and enforce
all laws and regulations in respect to municipal affairs, sub-
ject only to the restrictions and limitations provided in
their several charters, and in respect to other matters they
shall be subject to and controlled by general laws." Section
8 was amended so as to make it harmonize with the amend-
ment to section 6. [2] One of the purposes of these
amendments was to obviate the necessity of specifically
enumerating in the charter all powers relating to municipal
affairs in order to remove the city as to such matters from
the operation of general laws. (*City of Long Beach* v.
*Lisenby,* 175 Cal. 575 [166 Pac. 333].) It does not appear
that the city of Richmond has availed itself of the right
granted by the amendment of section 6 to bring the city
charter within its terms, but the appellants urge that the
construction placed upon the amendment in *Civic Center
Assn.* v. *Railroad Com.,* 175 Cal. 441 [166 Pac. 351], and
*Morgan* v. *Los Angeles,* 182 Cal. 301 [187 Pac. 1050], has
abrogated the right of the city of Richmond to proceed
under the act of 1915. We do not so construe those cases.
In the Civic Center case it appeared that the city of Los
Angeles had by an amendment to its charter in 1917 availed

itself of the privilege granted by the amendment of section 6 in 1914. With reference to the effect of this amendment on the city of Los Angeles, the court said, at page 448: ''The result is that the city has become independent of general laws upon municipal affairs. Upon such affairs a general law is of no force with respect to Los Angeles. If its charter gives it powers concerning them, it has those powers; if its charter is silent as to any such power, no general law can confer it. Whether such powers heretofore conferred upon it by general law, if any there be, are now abrogated or suspended, is a question we need not decide.'' It is observed that even where the city had elected to amend its charter pursuant to the amendment of section 6, the question of whether powers conferred upon the city by general law prior to such amendment had been abrogated or suspended was expressly left open and not decided. Nor is that question involved in this case. With reference to the status of the city charter after the constitutional amendment of section 6 in 1914 and before the Los Angeles charter amendment of 1917, the court further said, at page 447: ''In December, 1916, when this proceeding was begun in this court, the city of Los Angeles had not availed itself of the privilege given to it by the aforesaid amendments to sections 6 and 8. Consequently, so far as its charter provided for municipal affairs, it was paramount to general laws, but upon municipal affairs for which it did not provide and upon affairs not municipal, it was still subject to the operation of general laws.'' [3] There is nothing in the Morgan case inconsistent with that declaration and it must be concluded, in view of the fact that the city of Richmond has failed to avail itself of the right conferred by the constitutional amendment of 1914, that the city is in the same situation as it was prior to that amendment. In other words, if it had authority to proceed under the Improvement Bond Act prior to 1914, it still has that power. An examination of the Richmond city charter is therefore deemed necessary. The charter was adopted in 1909 (Stats. 1909, pp. 1263, 1281). Section 1 of article II thereof enumerates generally the powers vested in the city. In subdivision 4 of that section the city is granted the power to purchase and dispose of property of every kind and description for municipal purposes. In subdivision 7 power is given to levy and collect taxes and assessments. Subdivision 11 grants

power to improve streets and to levy special assessments to defray the whole or any part of the cost of such works or improvements. Under subdivision 22 the city is granted the power to "exercise such other powers as may be hereafter granted by the legislature to municipalities within the state," and under subdivision 23 "to exercise all other needful powers for the official administration of the municipal government, whether such powers are herein expressly enumerated or not." In section 1 of article III of the charter it is provided that all powers vested in the city are, with exceptions not here applicable, to be exercised by the council, with power to fix and establish the method and manner in which the vested powers shall be exercised. The charter does not prescribe the method of procedure for the levying of assessments for street improvements and the issuance of street improvement bonds and the council has not adopted a procedural ordinance on the subject.

It will be noted that the city in its original charter in 1909 was granted authority to exercise "such other powers as may be hereafter granted by the legislature to municipalities within the state." [4] This is especially true with reference to municipal affairs and it is well settled that the improvement of streets such as is here involved is a municipal affair (*Byrne* v. *Drain,* 127 Cal. 663, 667 [60 Pac. 433]; *Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441, 445 [166 Pac. 351], and cases cited). Under the Improvement Bond Act of 1915 the legislature authorized any municipality in the state to determine that serial bonds shall be issued in the manner therein provided to represent assessments for street improvements and by its terms specified that the assessments levied under the Improvement Act of 1911 may be the assessments for which such serial bonds shall be issued. [5] Pursuant to the authorization so granted by the legislature and by said subdivision 22 of section 1 of article II of the charter said resolution number 281–3 was adopted, incorporating therein the following clause: "This Resolution of Intention is adopted under the provisions of the 'Improvement Act of 1911,' and the 'Improvement Bond Act of 1915.'" From the foregoing it is clear that the city had the right to proceed, and did properly proceed, in the issuance of said serial bonds under the Improvement Bond Act of 1915.

2. It is next contended that, assuming power in the city to proceed under the Improvement Bond Act of 1915, the said bonds as issued are nullities because they impose a direct liability on the city to pay the same and were not issued in conformity with the requirements of section 18 of article XI of the constitution and the Municipal Indebtedness Act of 1901 (Stats. 1901, p. 27). The argument is based on the form of the bond as prescribed in section 6 of the act of 1915 as amended in 1917. The form of the bond as required by the original section (Stats. 1915, p. 1445) contained a provision with reference to the payment of the bond from the redemption fund provided for in the act as follows: "It is payable exclusively out of said fund, and neither the municipality nor any officer thereof is to be holden for payment otherwise of its principal or interest." The amendment of 1917 (Stats. 1917, p. 212) provides that the bond "including principal and interest is payable exclusively out of said fund," and it is urged that by reason of the omission in the amendment of the clause "and neither the municipality nor any officer thereof is to be holden for payment," it was attempted to make, and did make, the bond a general obligation of the city. [6] We find no merit in the contention. The form of the obligation was not changed by the amendment. The general plan of the act providing a method whereby bonds to represent the assessments could be issued, a redemption fund created for the payment of the principal and interest thereof and payment exclusively from said fund, remained the same. The bonds were still "payable exclusively from said fund" and the fund under the act was to be replenished only by payments on account of assessments or by sale for delinquency. The case of *Union Trust Co.* v. *State of California,* 154 Cal. 716 [24 L. R. A. (N. S.) 1111, 99 Pac. 183], involved the validity of improvement bonds issued by the city and county of San Francisco for the opening of Montgomery Avenue in said city. The form of the bond was on its face a direct promise on the part of the city to pay the same. It did, however, contain a statement that it was issued "in conformity with an act" of the legislature authorizing its issuance. After commenting on an earlier case involving the same bonds (*Liebman* v. *San Francisco,* 24 Fed. 705 [11 Sawy. 158]), which decided that the holders of the bonds could look to no other

source of payment than the special assessments provided in the act, this court used language very appropriate to the subject in the case at bar: "This view comports with the entire scheme of the act, which contemplates, not the creation of an indebtedness to be paid by funds raised by a general taxation of property in the city, or the state, but the creation of a special improvement district and the payment of the cost of the proposed improvement by means of assessments levied exclusively on lands within this district. These lands, which in the contemplation of the legislature would be benefited by the opening of the avenue, were to be made to pay, to the extent of the benefit received, the expense incurred in such opening. It was not anticipated by the framers of the law that any other source of payment would or could be resorted to."

[7] 3. It is next claimed that the council never acquired jurisdiction to order the work done under resolution of intention number 281–3, for the reason, as counsel contends, that the record does not disclose that the objections filed by the appellants on September 8, 1916, to the proceedings as contemplated by resolution number 281–2, were properly disposed of. It may be observed that under section 6 of the act of 1911 (Stats. 1911, p. 734) the protests which the property owner may file are "against the proposed work or against the extent of the assessment district or both." The communication filed by the appellants raised no objections to the proposed work nor to the extent of the assessment district, but objected only to the time of the maturity of the bonds. The issuance of such bonds is discretionary with the council under the bond act (Stats. 1915, p. 1441) and no opportunity for objection or protest to the issuance thereof is provided for by the terms of the act. But if it be assumed that an objection to the term of the bonds in a broad sense might be included within an objection to the "proposed work," still the record discloses that the objections and petition of the appellants were acceded to and granted by the council, for it immediately rescinded the resolution of intention number 281–2 and started anew by the adoption of resolution of intention number 281–3. No valid reason has been suggested by the appellants why the council did not have full power to so proceed and as no question of a statutory stay of further proceedings is in-

volved, it is idle for appellants now to contend, having obtained the result which they sought, that the council should have made a formal order granting or denying their request. The proceedings taken under the second resolution of intention were independent and complete in every detail. No protests or objections were interposed thereto by the appellants on any ground whatsoever and the council acquired jurisdiction to order the work performed.

4. It is further contended that the sale of the lots was invalid for the reason that they were not sold separately, but were sold in groups. Section 12 of the act of 1915 provides that upon default in payment of said bonds or of any installment of principal or interest thereof the lands securing such installments and assessments shall be sold and be subject to redemption in the same manner in which real property in said city is sold and redeemed for nonpayment of general municipal taxes. This section also provides that the city may be the purchaser at any delinquent sale in like manner in which it may become the purchaser of property sold for nonpayment of general municipal taxes. As hereinbefore noted, the city is authorized by its charter to levy and collect taxes and assessments and to fix the method and manner in which such powers shall be exercised. In June, 1916, the council adopted Ordinance Number 405, entitled: "An ordinance providing a system for the assessment, levying and collection of all city taxes in the city of Richmond." By this ordinance the city fixed and established a complete scheme for the levying and collection of municipal taxes. As to the assessment of property for municipal purposes the ordinance requires in section 17 thereof that the assessor prepare an assessment-book with appropriate headings in which must be listed all taxable property within the city and in which must be specified in separate columns, under appropriate headings, (1) the name of the person, if known, to whom the property is assessed, (2) lands by metes and bounds, etc., sufficient for identification, (3) city lots, numbers of lots and blocks, tract names and improvements thereon, and (6) the cash value of city lots. Section 52 requires the tax collector to publish the delinquent list, which must contain the names of the persons and a description of the property delinquent, and the amount of the taxes, penalties, and costs due opposite each name and

description. Under this section the tax collector is also required to publish with the delinquent tax list a notice that unless the taxes delinquent, together with the costs and penalties be paid, the property upon which such taxes are a lien will be sold to the city of Richmond. Section 57 provides for a redemption within five years from the date of the sale and section 61 provides that the city auditor shall make an estimate of the amount required to redeem on application of any person desiring to redeem and deliver to such person a certificate specifying the several items in the amount to be paid. It is apparent from the procedure outlined in this ordinance that the lots and lands in the city must be separately assessed for municipal purposes as therein provided and that each of such lots or parcels of land should be sold separately. It may be said that the requirements of said section 17 providing that the assessor list the several parcels of land for purposes of general municipal taxes has no direct bearing upon the method of assessment under the act of 1911 for the reason that the assessments involved herein were made under the resolution of intention and could only be made under that act. But the general plan of the city ordinance, including the method of assessment, is of assistance in determining what method should be followed by the city in the sale of lands assessed for street improvements under section 12 of the act of 1911. If the method provided by the city for the sale of property for delinquent municipal taxes requires that the several lots and lands be sold separately, it must necessarily follow that any lots and lands sold by the city to satisfy delinquent assessments for street improvements must also be sold separately in order to satisfy the requirements of section 12 of the Improvement Act that ''upon default in payment, the lands securing such installments and assessments shall be sold in the same manner in which real property in such city is sold for the nonpayment of general municipal taxes.'' It must be concluded that the method provided by the city for the sale of property to satisfy unpaid taxes for municipal purposes contemplates that the same be separately advertised and sold.

The record in this case shows that the several lots of the plaintiffs were located in a tract known as ''East Shore Park'' and were separately assessed under the Improvement

Act. Each item specified the lot, block, assessment number and amount of the assessment in cash. But in the delinquent roll and in the notice of sale the lots were not so separately designated, but were grouped. For example: Lots 23, 24, and 25 of block "M" were grouped and sold as one item; lots 33, 34, and 35 in the same block were grouped and sold as one item; lots 1 to 3 and 6 to 12 in block "N" were grouped and sold as one item, and so on. This plan was followed throughout, and resulted in the sale of each lot in a particular group to satisfy the lien on each of the other lots in the same group. [8] We think the method thus pursued by the city was unauthorized. In *Brady* v. *Kelly,* 52 Cal. 371, which was an action to enforce a street assessment, the court said: "Where two or more lots are assessed for the expenses of work on a street, each lot is chargeable only with the amount assessed upon it, and not for the amount assessed against another lot, . . . " In *Gillis* v. *Cleveland,* 87 Cal. 214, 218 [25 Pac. 351, 353], the court said with reference to a lien against lots which were required to be "separately assessed," under the Vrooman Act (Stats. 1885, p. 174): "It is obvious that the lien here referred to is one for the particular amount assessed against each lot, and not the whole amount of several assessments against all the lots of one owner, without regard to the proportion properly chargeable to each." (See, also, *Knox* v. *Higby,* 76 Cal. 264 [18 Pac. 381].)

[9] 5. It is urged that the Improvement Bond Act of 1915 prescribing the form of the bond and in specifying the manner of its payment violates the provisions of section 31 of article IV of the constitution prohibiting the legislature from pledging the credit of any city in the state. But the contention is based upon the false assumption that the bonds when issued are direct and primary obligations of the city. As has been pointed out, they were not under the original bond act of 1915 and the legal effect so far as the obligation of the city is concerned was not changed in the form prescribed by the amendment of 1917. Hence no difficulty with reference to the applicability of the form prescribed by such amendment to the proceedings theretofore commenced can arise herein and the rights of the appellants were not affected by the amendment.

6. Several objections to the validity of the tax Ordinance No. 405 are raised. In the main they relate to the method followed by the city in advertising for sale and selling the property of the appellants, but inasmuch as we have decided that the sale under the ordinance was irregular and appellants' contentions in that regard have been sustained, we deem it unnecessary specifically to enumerate or pass upon them. [10] But the contention that the provisions of said ordinance to the effect that the property when sold shall be sold to the city is unconstitutional should be determined. It is the position of the appellants that the ordinance adopted by the city requiring the city to purchase the property at the sale is imposing a burden upon all of its taxpayers for the benefit of the bondholder, who holds the same in private ownership, thus constituting a gift to the bondholder in contravention of section 31 of article IV of the constitution. .The argument assumes that in the improvement of streets the work is a private matter. On the contrary, such work is for a public purpose. The city might have expended its general funds for that purpose. It was not compelled to do so and when it elected to proceed under the general street improvement laws, it simply adopted the means provided by law whereby it might in accordance therewith exercise a public function without incurring a contractual liability such as is contemplated under section 18 of article XI of the constitution and the bond act of 1901. When the city elects to proceed under said act it assumes the burden of discharging its duties thereunder to the end that the assessment may be enforced (see *Federal Construction Co.* v. *Wold,* 30 Cal. App. 360 [158 Pac. 340]). We discover no reason from this or any point raised by the appellants why the city may not properly proceed under its tax ordinance to enforce the assessments for delinquency in the payment thereof.

[11] But the fact that the sale of appellants' property was invalid would not necessarily entitle the appellants to a decree quieting their title under the circumstances here shown. By appropriate proceedings the council acquired jurisdiction to order the work performed. In fact, all the proceedings leading up to and including the issuance of the bonds were valid. The work has been performed and the lands have been benefited by the improvements and the

expenditures incident thereto. The plaintiffs in this equitable action seek to relieve the lands from the burden of the assessment for such benefits without paying or offering to pay their just portion of the cost of the improvements. In the early case of *Weber* v. *City of San Francisco,* 1 Cal. 455, it was said: "An assessment was laid for the purpose of improving a street, and thereby benefiting the property of the plaintiff in common with the property of other persons owning lots on the same street. The work has been completed; and after the plaintiff has derived all the benefit and profit therefrom, and after the contractors with the city have expended their labor and money to improve the plaintiff's lots, he comes into court, when he is called upon to pay his proportion of the expense, and asks, in effect, that he may be exempted from the general burden imposed for the common benefit of himself and others, on the ground that there are some irregularities in the mode of making the assessments. I think, that should not be permitted. The plaintiff asks for the equitable interposition of the court to prevent a sale of his land by the defendants; but, every principle of equity and justice demands that the plaintiff should pay; and it is one of the first maxims of equity jurisprudence, that he who asks equity must do equity." The rule thus announced has been approved and consistently followed in this state (*Estabrook* v. *O'Brien,* 98 Cal. 671 [33 Pac. 765]; *Ellis* v. *Witmer,* 134 Cal. 249 [66 Pac. 301]; *Couts* v. *Cornell,* 147 Cal. 560 [109 Am. St. Rep. 168, 82 Pac. 194]; *Savings & Loan Society* v. *Burke,* 151 Cal. 616 [91 Pac. 504]; *Holland* v. *Hotchkiss,* 162 Cal. 366 [L. R. A. 1915C, 492, 123 Pac. 258]). The later case of *Hayne* v. *San Francisco,* 174 Cal. 185 [162 Pac. 625], was an action to quiet title. The defendant asserted a lien on the land by virtue of certain special assessments levied to pay the costs of the construction of a tunnel. The plaintiffs did not pay or offer to pay the assessments. The court said: "As we find the assessment to be valid, the property of the plaintiffs is justly liable for its due proportion thereof. In such cases the plaintiff is not entitled to any relief in a court of equity unless he shall pay, or offer to pay, the amount actually due upon the assessment against his property. As was said in *Ellis* v. *Witmer,* 134 Cal. 253 [66 Pac. 303], 'this being the case they cannot successfully invoke the assistance

of a court of equity against the irregularities in the sale complained of, unless on the condition of paying what is due from them. Here no such condition has been imposed by the court, nor is there an offer in the complaint to pay what is due. The plaintiffs were therefore not entitled to relief.' '' Such is the situation of appellants in this case.

The judgment is affirmed.

Myers, C. J., Lawlor, J., Lennon, J., Waste, J., Richards, J., and Seawell, J., concurred.

Rehearing denied.

All the Justices concurred.