[S. F. No. 18028.   In Bank.   Dec. 28, 1949.]

CITY OF GRASS VALLEY, Petitioner, v. J. L. WALKIN-
SHAW, as City Auditor, etc., Respondent.

Kirkbride, Wilson, Harzfeld & Wallace for Petitioner.

William J. Cassettari for Respondent.

SHENK, J.—In this proceeding the petitioner, city of Grass Valley, seeks the writ of mandate to compel the respondent, its auditor, to extend on the city's property tax rolls, in addition to the tax for general municipal purposes, a special levy

of 63 cents to discharge the 1950 payments of interest and principal on bonded indebtedness. The controversy is submitted on an agreed statement of the case pursuant to sections 1138-1140 of the Code of Civil Procedure.

In 1921 the petitioner, then a city of the sixth class, adopted a freeholders' charter (Stats. 1921, p. 1889) and thereby accepted the privilege of autonomous rule offered by sections 6 and 8 of article XI of the state Constitution as amended in 1914.

Section 2(i) of the charter refers to the city's power to levy and collect ad valorem taxes "subject to the limitations hereinafter imposed."

Section 2(j) prohibits the contracting of indebtedness in excess of $5,000 except with the consent of two-thirds of the qualified electors voting thereon and requires bonds to be issued therefor. The following proviso appears: "PROVIDED, that in the procedure for the creation and issuance of such bonded indebtedness the general law of the State of California in force at the time such proceedings are taken shall be observed and followed."

Section 4 of the charter provides the limitation (referred to in section 2(i)) on the "property tax, to be levied by the City Council upon all property real and personal, within said City at 12 o'clock of the first Monday in March of each year, which may equal but shall never exceed seventy-five (75) cents on every one hundred dollars, assessed valuation of such property."

The present assessed valuation of property in the city of Grass Valley is $3,437,790. The 75-cent rate, levied thereon, will raise $25,783.42. The whole of this amount is required for general municipal purposes.

The Bond Act of 1901 (Stats. 1901, p. 27 as amended; 2 Deering's Gen. Laws, Act 5178) authorizes a municipal corporation to incur bonded indebtedness to pay the cost of a municipal improvement where the expenditure would be too great to be paid out of its ordinary annual income and revenue. The act provides the procedure for the creation and issuance of bonds to meet the cost of such improvements. Section 7 empowers the city, at the time of fixing the general tax rate, to levy and collect a sufficient tax to meet the current payments of bond interest and principal. The section states that the "taxes herein required to be levied and collected shall be in addition to all other taxes levied for municipal purposes. . . ."

In 1923, pursuant to section 2(j) of the charter ·and the authority of the electors, the city followed the provisions of the 1901 Bond Act in creating and issuing a bonded indebtedness of $100,000 to meet the cost of street improvements. In conformity with the statutory provisions periodic interest and principal payments on the bonds were made by the levy in the years 1924-1948 of a special tax of 55 cents in addition to the 75-cent charter rate.

In June, 1949, the electors of the city duly authorized a ·bonded indebtedness of $398,000 to meet the cost of necessary sanitary improvements, including the acquisition of lands and easements, and the construction of a sewage collection, outfall and treatment works system. On July 1, 1949, the city issued 398 bonds of $1,000 denomination bearing interest of not over $2\frac{3}{4}$ per cent, and maturing in annual amounts varying from $10,000 to $18,000 through the year 1980. The city council has levied the 63-cent special tax to meet the interest and principal payments to fall due the first year, but the respondent auditor has refused to extend the special levy on the tax rolls. Contracts have been let for the construction of the improvements. The bonds have been sold but remain undelivered pending the outcome· of the present controversy.

The respondent contends that the 75-cent charter rate is a limitation for all requirements, including the discharge of the bonded indebtedness created pursuant to section 2(j) of the charter and the 1901 Bond Act. He seeks support for his position in the language of sections 2(i) and 4 of the charter providing the 75-cent rate limitation and of section 2(j) incorporating the Bond Act procedure for the creation and issuance of the bonds. He argues that since the language of section 2(j) makes no specific reference to a requirement for the levy of a special tax to meet payments on the bonds, the charter limitation controls and restricts the rate which may be levied for both general and special purposes.

█ Established law governing the exercise of municipal powers under a home· rule charter.and principles of construction applicable to charter provisions require the rejection of the respondent's· contentions. He has overlooked the controlling principle that by accepting the privilege of autonomous rule the city has all powers over. municipal affairs, otherwise lawfully exercised, subject only to .the clear .and explicit. limitations and restrictions contained in the charter. █ The charter operates not as a grant of power,· but as an instrument of limitation and restriction on the exercise of power over all mu-

nicipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. (*West Coast Advertising Co.* v. *San Francisco,* 14 Cal. 2d 516, 521-522, 525 [95 P.2d 138] and cases cited; *City of Oakland* v. *Williams,* 15 Cal.2d 542, 550 [103 P.2d 168]; *San Francisco* v. *Boyd,* 17 Cal.2d 606, 617-618 [110 P.2d 1036]; *Kennedy* v. *Ross,* 28 Cal.2d 569, 575 [170 P.2d 904]; *Ayres* v. *City Council of Los Angeles, ante,* pp. 31, 37 [207 P.2d 1]. ■ Thus in respect to municipal affairs the city is not subject to general law except as the charter may provide. (*Heilbron* v. *Sumner,* 186 Cal. 648, 650 [200 P. 409]; *Muehleisen* v. *Forward,* 4 Cal.2d 17, 19 [46 P.2d 969].) ■ As recognized in the West Coast Advertising case, the levy of taxes for city purposes is a municipal affair; the collection, treatment and disposal of city sewage and the making of contracts therefor are likewise municipal affairs (*Loop Lumber Co.* v. *Van Loben Sels,* 173 Cal. 228, 232 [159 P. 600]), and neither may be held to be circumscribed except as expressly limited by the charter provisions. ■ All rules of statutory construction as applied to charter provisions (*Braun, Bryant & Austin* v. *McGuire,* 201 Cal. 134, 143 [255 P. 808]; *Hartford Acc. etc. Co.* v. *City of Tulare,* 30 Cal.2d 832, 835 [186 P.2d 121]) are subordinate to this controlling principle. The former guide—that municipalities have only the powers conferred and those necessarily incident thereto (*San Francisco* v. *Boyle,* 195 Cal. 426 [233 P. 965])—is inapplicable. A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated. So guided, reason dictates that the full exercise of the power is permitted except as clearly and explicitly curtailed. Thus in construing the city's charter a restriction on the exercise of municipal power may not be implied.

The question then is whether the exercise of the power which is the subject matter of section 2(j) of the charter is to be deemed limited or controlled by the provisions of sections 2(i) and 4.

Section 2(i) deals with the general taxing power of the city, which is "subject to the limitations hereinafter imposed." Section 4 states the limitation, namely, that such tax "may equal but shall never exceed" a 75-cent rate.

Section 2(j) treats of the power to borrow money, and limits contracts of indebtedness to $5,000 except with the

consent of two-thirds of the electors of the city. Bonds are required to meet the cost of the duly authorized greater indebtedness, the procedure for the creation and issuance thereof to be according to general law. There is in this section no language expressly withholding any existing power to levy taxes to discharge the bonded indebtedness. Nor is there in the tax limitation of section 4 a specific inclusion of an existing power to levy such special tax. As will be seen the power to tax for the purpose of discharging authorized bonded indebtedness is a necessary accompaniment of the power to contract the indebtedness. ■ In the absence of specific allusion to that subject matter elsewhere in the charter, all the restrictions or limitations upon the exercise of the power to contract a bonded indebtedness including the requirement to tax to discharge it must be found in section 2(j). Thus sections 2(i) and 4 on the one hand, and section 2(j) on the other, treat of two distinct powers. The first must be deemed to have reference to the taxing power for general purposes; and the second to the power to tax for the municipal improvements as well as the authority to contract therefor. Sections 2(i) and 4 may not impose by implication a limitation on the separately treated power to contract an indebtedness in excess of $5,000, which specified amount the framers deemed was the maximum which could be covered by the general tax rate.

■ Nevertheless the respondent purports to find in the language of section 2(j), adopting the procedure of the general law in creating and issuing the bonds, a limitation on any existing power to levy taxes to discharge an authorized bonded indebtedness. He says that the reference to procedure in the creation and issuance of the bonds precludes a holding that the method of payment required by section 7 of the Bond Act was adopted. The effect claimed would leave incomplete the provision for the bonded indebtedness. In such case the direct reference to the general law is deemed sufficient to include the complete scheme. (*Muehleisen* v. *Forward, supra,* 4 Cal.2d at p. 20.) However, since the power to tax specially to discharge the bonded indebtedness exists independently of the provision in the general law, that power may be exercised unless the language of section 2(j) expressly prohibits it.

■ The duly conferred authority to create and issue bonds for the construction of the authorized sanitary improvements not only bestowed the power to levy a special tax to discharge

the bonded indebtedness but made it the duty of the city to exercise the taxing power to that end. It has been recognized that when the municipality has authority to contract an extraordinary debt by the issuance of negotiable securities, the power to levy taxes sufficient to meet the obligation is conclusively deemed to exist unless the law (here the charter) clearly manifests a contrary intention. ■ The power to tax is necessarily an ingredient of the power to contract, since the obligation can be met only through the instrumentality of taxation. The power so to tax is not implied but is express since it is a duty growing out of the authority to contract. The power to do the thing carries with it the authority to use the necessary means to accomplish it, and is not affected by a charter tax limitation. (*United States* v. *New Orleans,* 98 U.S. 381, 393-394 [25 L.Ed. 225] ; *Ralls County Court* v. *United States,* 105 U.S. 733, 735-736 [26 L.Ed. 1220] and cases cited; *Quincy* v. *Jackson,* 113 U.S. 332, 337-338 [5 S.Ct. 544, 28 L.Ed. 1001] and cases cited; *Dutton* v. *City of Aurora,* 114 Ill. 138 [28 N.E. 461, 462] ; *City of Austin* v. *Nalle,* 85 Tex. 520 [22 S.W. 668, 673, 960].) No case presented or discovered denies this result in the absence of restriction expressly designed to withhold the power or place a limitation on its exercise. On the contrary, it has been indicated in this state that the discharge of that duty may not indirectly be repudiated by provision in the charter for a limitation of the tax rate which would render performance of the duty impossible. (*Wilkinson* v. *Lund,* 102 Cal.App. 767, 773 [283 P. 385].) The provisions of the charter do not expressly withhold or limit the exercise of the power, and in the absence of a limiting provision the authority to contract the bonded indebtedness includes authority to exercise the taxing power by levying a special tax to discharge it.

■ If it may be said that the charter provisions seem to be conflicting, it does not follow that they are irreconcilable. Full force and effect may be given to both provisions when each is seen to have a different and distinct purpose. Assuming ambiguity, a construction which would prevent the city from issuing bonds for necessary public improvements authorized by the electorate would be unreasonable. The city adopted a construction favorable to the exercise of the power by the issuance of the 1923 bonds, and its interpretation was a proper one. The fact that the city has acted in conformity with this construction for a period of some 25 years

is entitled to due weight. (*Reuter* v. *Board of Supervisors,* 220 Cal. 314, 323 [30 P.2d 417].) The effect of the contemporaneous construction is that the 75-cent tax limitation of section 4 of the charter was intended to curb extravagance in the exercise of the discretionary power to tax for general municipal purposes but was not intended to prevent the exercise of the taxing power for the purpose of discharging a bonded indebtedness duly authorized by the electorate pursuant to section 2(j) of the charter.

The taxing power sought to be exercised exists. There is no express limitation upon its exercise except that the bonded indebtedness must be duly authorized. The electorate, legislative body, and taxpayers of the city have governed themselves in accord with the existence of the power and without the tax limitation invoked by the respondent. The writ of mandate is appropriate to compel performance of the respondent's official duty (Code Civ. Proc., § 1085); and the petitioner is entitled to the relief sought.

Let the peremptory writ issue.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent.

The charter of Grass Valley squarely and explicitly provides that the "property tax . . . may equal but shall never exceed seventy-five (75) cents on every one hundred dollars, assessed valuation of . . . property." That charter has not been amended by any lawful means but now this court sustains the city council in imposing on the people of Grass Valley a property tax rate of $1.38 on every one hundred dollars of assessed valuation.

The language of the charter is clear and unequivocal; such charter is the basic governing law of the city; the residents of that city are entitled to have the law upheld and to expect and demand that this court shall enforce it. None of the arguments for the majority decision, nor all of them together, can escape the fact that the effect of that decision—indeed, its sole object—is to uphold a property tax which *does exceed* "seventy-five (75) cents on every one hundred dollars." However desirable that result may appear to the majority justices it is not sound law; and the indulgence in so straining law to reach an end does not in my view constitute desirable judicial practice.

By the terms of the charter and by prior decisions of this court, hereinafter cited, it is unescapable that the 63-cent tax levied by the city council for the purpose of meeting principal and interest payments on the sanitary improvement bonds issued by the city was and is invalid because it was levied over and above, and in addition to, the maximum property tax rate set forth in the charter (Stats. 1921, p. 1889). If we are to respect and uphold established law the peremptory writ sought by petitioner should be denied.

The provisions of the city charter which are pertinent to this controversy are found in sections 2 and 4 of article I.[1]

At a special election called by the council and held in June, 1949, the city electors approved the incurring by the city of a bonded indebtedness of some $398,000 for the acquisition, construction, and completion of a city sewer system. The bond proceedings ''were undertaken for the purpose of financing the cost of improvements for treating and disposing of the sanitary sewage of said City.'' The bonds were issued, in the denomination of $1,000 each, with maturity dates commencing on July 1, 1950, and extending through July 1, 1980. In September, 1949, the council fixed the ''general tax rate for all City purposes for the year 1949-50,'' at the rate of 75 cents on each one hundred dollars of assessed valuation of property in the city and also levied on such property ''a special tax at the rate of sixty-three'' cents to meet the prin-

[1]Such provisions are as follows: ''Sec. 2. The City shall have power: . . .

''(i) To levy and collect taxes upon any or all objects of taxation upon which a city may levy a tax in accordance with the Constitution and laws of this State, subject to the limitations hereinafter imposed.

''(j) To borrow money for any of the purposes for which the City is authorized to provide, and for the purpose of carrying out any of the powers granted to the City by this Charter, but shall not contract indebtedness on behalf of the City in excess of the sum of five thousand (5,000) dollars, without the consent of two-thirds of the qualified electors voting thereon, and to issue bonds therefor; PROVIDED, that in the procedure for the creation and issuance of such bonded indebtedness the general law of the State of California in force at the time such proceedings are taken, shall be observed and followed.

''(k) To do and perform any and all other acts and things appropriate to a municipal corporation which are not specifically forbidden by the Constitution or laws of this State, or which may be for the general welfare and good of the people of said City of Grass Valley, and no enumeration of powers in this Charter shall be taken to imply any limitation of the foregoing general grant of power. . . .

''Sec. 4. A property tax, to be levied by the City Council upon all property, real and personal, within said City at 12 o'clock, of the first Monday in March of each year, which may equal but shall never exceed seventy-five (75) cents on every one hundred dollars, assessed valuation of such property.''

cipal and interest payments falling due on the bonds in January and July, 1950.

As claimed plausible "authority" for the additional 63-cent rate the city relies upon subsection (j) of section 2, article I, of the charter, and also upon section 7[2] of an act of the Legislature which took effect on February 25, 1901 (Stats. 1901, p. 27, as amended; 2 Deering's Gen. Laws, Act 5178), and which has to do with the incurring of bonded indebtedness by cities, towns and municipal corporations for municipal improvements and regulating the acquisition, construction or completion thereof. The parties state that "the whole of said seventy-five (75) cent rate is necessary for general city purposes, and that City would be unable to finance the cost of any general City improvements unless section 7 of said 1901 Act is applicable to said City as a qualification of section 4 of Article I of said Charter."

The sale of the bonds has been "awarded" to "the highest responsible bidder therefor" and contracts have been let for the construction of the contemplated improvements but "the consideration for the sale of said bonds will not be received until and unless the City receives a favorable decision herein." It is shown that on a prior occasion, "pursuant to the authority granted at an election . . . in the year 1923, under the provisions of said 1901 Bond Act, the City issued . . . general obligation bonds . . . in the amount of $100,000.00 for street improvements." Such bonds matured in the years 1924 through 1948, and "a special tax separate and distinct from and in excess of the general City tax was levied in each of said years for the payment of the principal and interest of said bonds, and . . . in the fiscal year 1923-1924 the amount of the special levy therefore was" 55 cents.

As declared in *West Coast Advertising Co. v. San Francisco*

---

[2]Section 7 reads as follows: "The legislative branch of said city . . . shall at the time of fixing the general tax levy, and in the manner for such general tax levy provided, levy and collect annually each year until said bonds are paid, or until there shall be a sum in the treasury of said city . . . set apart for that purpose to meet all sums coming due for principal and interest on such bonds, a tax sufficient to pay the annual interest on such bonds as the same becomes due, and also such part of the principal thereof as shall become due before the proceeds of a tax levied at the time for making the next general tax levy can be made available for the payment of such principal. . . . *The taxes herein required to be levied and collected shall be in addition to all other taxes levied for municipal purposes,* and shall be collected at the time and in the same manner as other municipal taxes are collected, and be used for no other purpose than the payment of said bonds and accruing interest." (Italics added.)

(1939), 14 Cal.2d 516, 521-522 [95 P.2d 138], "It is now established by a line of decisions of the courts of this state that a city which has availed itself of the provisions of the Constitution as amended in 1914 has full control over its municipal affairs unaffected by general laws on the same subject-matters, and that it has such control whether or not its charter specifically provides for the particular power sought to be exercised, so long as the power is exercised within the limitations or restrictions placed in the charter. (*Stege* v. *City of Richmond*, 194 Cal. 305 [228 P. 461]; *Brougher* v. *Board of Public Works*, 205 Cal. 426 [271 P. 487]; *Butterworth* v. *Boyd*, 12 Cal.2d 140 [82 P.2d 434]; *Bank* v. *Bell, supra* [62 Cal.App. (1923) 320 (217 P. 538).] As stated in *In re Galusha*, 184 Cal. 697, at page 700 [195 P. 406], 'The question, then, is not whether the charter grants the power to impose the tax, but whether it prohibits the tax, . . .' Also in *In re Nowak*, 184 Cal. 701, 704 [195 P. 402], it was said: 'The net result . . . is that, as to municipal affairs, the charter, instead of being a grant of power, is, in effect, a limitation of powers, and, the imposition of the tax for revenue purposes being strictly a municipal affair, the city has the power to impose that tax unless the power was taken from it by the charter itself. [Citing cases.]'

"The foregoing cited cases leave no doubt that such a charter is no longer a grant of powers, but is rather an instrument which accepts the privilege granted by the Constitution of complete autonomous rule with respect to municipal affairs, and which otherwise serves merely to specify the limitations and restrictions upon the exercise of the powers so granted and accepted. Therefore any such power not expressly forbidden may be exercised by the municipality, and any limitations upon its exercise are those only which have been specified in the charter." (See, also, *Adams* v. *Wolff* (1948), 84 Cal. App.2d 435, 440-441 [190 P.2d 665].)

The "city is not subject to general laws in matters concerning municipal affairs except as the charter itself may provide." (*Heilbron* v. *Sumner* (1921), 186 Cal. 648, 650 [200 P. 409].) "That street and sewer work in a municipality . . . are 'municipal affairs' within the meaning of the constitutional provision cannot be doubted." (*Loop Lumber Co.* v. *Van Loben Sels* (1916), 173 Cal. 228, 232 [159 P. 600].) The "levy of taxes by a municipality for revenue purposes . . . is strictly a municipal affair . . . [and] included within the special grant and privilege tendered by the constitutional amend-

ment in 1914." (*West Coast Advertising Co.* v. *San Francisco* (1939), *supra*, p. 524.)

A charter provision is "subject to the same rules of interpretation as a statute. If it be free from ambiguity no construction or interpretation is required or permissible and it must be given no meaning other than its words import. 'It is a cardinal rule applicable to the interpretation of statutes that in order to ascertain the intent of the legislature in enacting the same, recourse must first be had to the language of the statute itself; and that if the words of enactment given their ordinary and proper signification are reasonably free from ambiguity and uncertainty, the courts will look no further to ascertain its meaning.' (*People* v. *Stanley,* 193 Cal. 428, 431 [225 P. 1, 2].) In the construction of the instrument the office of the court 'is simply to ascertain what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted' (Code of Civ. Proc., sec. 1858, 23 Cal.Jur. 729)." (*Braun, Bryant & Austin* v. *McGuire* (1927), 201 Cal. 134, 143 [255 P. 808].) "Where there is a conflict between two provisions in a statute a specific or special provision controls over a general one [citations]." (*Hartford Acc. etc. Co.* v. *City of Tulare* (1947), 30 Cal.2d 832, 835 [186 P.2d 121].)

The problem here is to determine, in conformity with the foregoing rules, whether the property tax limitation of 75 cents expressed in section 4 of article I of the city charter was intended by the electors who adopted the charter (Const., art. XI, § 8, subd. (g)) to include taxes levied for the payment of principal and interest on bonded indebtedness contracted by the city and discussed in subsection (j) of section 2 of article I of the charter. The city urges that the provision of subsection (j) "that in the *procedure* for the *creation* and *issuance* of such bonded indebtedness the general law of the State of California in force at the time such proceedings are taken, shall be observed and followed" (italics added) authorizes and requires the city council, under section 7 of the act of February 25, 1901 (quoted hereinabove), not only to levy and collect to meet the bond payments a property tax "in addition to all other taxes levied for municipal purposes" but to add such tax to the 75-cent maximum if the council finds it expedient so to do.

At the outset, the city relies upon *Ex parte Lemon* (1904), 143 Cal. 558 [77 P. 455, 65 L.R.A. 946]; *Ransome-Crummey Co.* v. *Bennett* (1918), 177 Cal. 560, 563 [171 P. 304]; and

*Richards* v. *Wheeler* (1935), 10 Cal.App.2d 108 [51 P.2d 436], as supporting the proposition that a "provision of the general law incorporated into a charter has all of the force and effect of any other charter section." It appears, however, that in the Lemon and the Ransome-Crummey Company cases the statutes in question had been made, in their entirety, a part of the city's organic law, and, as pointed out in *West Coast Advertising Co.* v. *San Francisco* (1939), *supra,* 14 Cal.2d 516, 522, *Richards* v. *Wheeler* was apparently concerned with a charter framed as a specific grant of power "rather than with limitations upon recognized existing powers . . ." Where the charter adopts only a portion of a general law, or adopts a general law subject to reservations or provisos expressed in the charter, the general law controls only to the extent that it does not conflict with other charter provisions. (See *Muehleisen* v. *Forward* (1935), 4 Cal.2d 17, 19-20 [46 P.2d 969].)

Here it appears that the city of Grass Valley in its charter has in express language adopted only a portion of the general law relating to the incurring of bonded indebtedness for municipal improvements (2 Deering's Gen. Laws, Act 5178), to wit, the *procedure* to be followed in the *creation* and the *issuance* of such bonds, and has neither expressly nor by any legally permissible implication adopted the provisions embodied in section 7 of the act, treating of the levying of a tax "in addition to all other taxes levied for municipal purposes" for the purpose of meeting bond principal and interest payments. Much less does the charter state that the express property tax limitation of 75 cents may be ignored, or does not apply to and include, property taxes which may be levied to pay the bonds. As declared in the Muehleisen case, *supra,* "It is impossible to hold that the proceedings under review were valid. The question is not of strict or liberal construction, nor is the case one of immaterial or unsubstantial departure from formal requirements. The charter provision is clear and requires no interpretation; and the requirements [concerning the recall of elective city officials] which were not followed are among the most important elements of the . . . system . . ."

The city urges that the tax limitation specified in section 4 of the charter applies only to "general" taxes levied for "general" municipal expenses, and that the meeting of bond payments for municipal improvements constitutes a "special" purpose warranting a "special" tax over and above the charter limitation. In support of such position the city relies upon

a number of cases arising both in California, and in other jurisdictions. Review of such cases reveals, however, that they were decided under charter provisions and statutes differing in both language and effect from those now before us.

*Wilkinson* v. *Lund* (1929), 102 Cal.App. 767, 774 [283 P. 385], concerned the validity of a tax limitation provision in a *county*, rather that a *city*, charter, and it was held that under the Constitution (art. XI, § 7½, subd. 4) the taxation power of a county board of supervisors is controlled by general law rather than by the charter limitation; by contrast, the city charter now before us is controlling over general law. *Myers* v. *Placerville* (1870), 1 Cal. Unrep. 565, concerns the interpretation of acts of the state Legislature, rather than charter limitations which control over such acts. In *People* v. *Rigney* (1883), 63 Cal. 296, the question was whether taxes beyond a charter limitation were "authorized" by subsequent acts of the Legislature, which at that time controlled over charter provisions (see *Bank* v. *Bell* (1923), 62 Cal.App. 320, 324-325 [217 P. 538]). *American Co.* v. *City of Lakeport* (1934), 220 Cal. 548 [32 P.2d 622]; *Los Angeles etc. Corp.* v. *City Council* (1936), 18 Cal.App.2d 97, 100-102 [63 P.2d 326]; and *Federal Construction Co.* v. *Wold* (1916), 30 Cal.App. 360, 361 [158 P. 340], had to do with constitutional (art. XI, § 18) and statutory (Stats. 1935, p. 1254) debt and expenditure limitations placed on cities, and held that such limitations did not apply to the mandatory, contingent, liability imposed upon cities by the Improvement Bond Act of 1915 (Stats. 1915, p. 1441; 3 Deering's Gen. Laws, Act 8209) to pay into a tax redemption fund the amount of the delinquent assessment and interest against lands sold for default in payment thereof and purchased by the city. By contrast, there is no mandatory liability upon the city under the charter here involved to levy a property tax at a rate in excess of the charter limitation. In *Gualco* v. *City of Bakersfield* (1927), 86 Cal.App. 167, 171 [260 P. 308], it was determined that the city charter had not directly provided for street improvement by assessment proceedings, but instead had adopted the procedural provisions of general state law with respect thereto, and that therefore the period specified by state law for publishing notice for bids should be observed.

*Thatcher* v. *Chicago & N. W. Ry. Co.* (1887), 120 Ill. 560 [11 N.E. 853]; *Dutton* v. *Aurora* (1885), 114 Ill. 138 [28 N.E. 461]; and *Werner* v. *Galveston* (1888), 72 Tex. 22, 29 [7 S.W.

726, 728, 12 S.W. 159], also relied upon by the city, relate to the construction of state statutes which governed the cities involved, and are of little assistance here. *Quincy* v. *Jackson* (1885), 113 U.S. 332, 335 [5 S.Ct. 544, 28 L.Ed. 1001] ; *Columbus Water Co.* v. *Columbus* (1892), 48 Kan. 99 [28 P. 1097, 1104, 15 L.R.A. 354] ; and *Dawson County* v. *Clark* (1899), 58 Neb. 756, 764 [79 N.W. 822], construed statutes or charter provisions expressly limiting the tax rate for ''general purposes'' or ''general expenses,'' but (in the Dawson case) permitting ''other taxes'' authorized by law. In *City of Austin* v. *Nalle* (1893), 85 Tex. 520 [22 S.W. 668, 960], the charter limited the tax to 1 per cent which was to be used ''for the current expense and general improvement of the city,'' and it was held that the 1 per cent was not intended to cover the interest and sinking fund of a bonded indebtedness for construction and operation of a city water and light system, also expressly authorized by the charter. In *LaMar Water & Electric Light Co.* v. *LaMar* (1895), 128 Mo. 188 [26 S.W. 1025, 31 S.W. 756, 32 L.R.A. 157], the constitutional tax limitation at issue was held not to include a tax which a subsequent section of the same constitution expressly directed to be levied to meet interest payments and create a sinking fund for city indebtedness before such indebtedness could be incurred. The levy upheld in *Pleasant Grove City* v. *Holman* (1921), 59 Utah 242 [202 P. 1096, 1098], was a special assessment for the benefit to land from the use of water, and not a property tax as that term is used here and is commonly understood. In *Butz* v. *City of Muscatine* (1869), 75 U.S. (8 Wall.) 575, 580 [19 L.Ed. 490], the tax levy involved (to pay a judgment against an Iowa city) was held to be mandatory under a state statute which controlled over the city's charter tax limitation; however, it may be noted that the Iowa Supreme Court reached a contrary conclusion as to the same state statute (*Clark, Dodge & Co.* v. *City of Davenport* (1863), 14 Iowa 494) and the Supreme Court of the United States, in *Supervisors* v. *United States* (1873), 85 U.S. (18 Wall.) 71, 80-83 [21 L.Ed. 771], declared itself bound by the state court decision, and followed it.

In contrast to the statutes and charter provisions and the control by state Legislatures over many of the municipalities involved in the aforementioned decisions, the city of Grass Valley, a municipal corporation independent of general state

legislation, whose charter is its organic law or local constitution (see *Brougher* v. *Board of Public Works* (1928), 205 Cal. 426, 438 [271 P. 487] ; *Dalton* v. *Lelande* (1913), 22 Cal.App. 481 [135 P. 54] ; *Adams* v. *Wolff* (1948), *supra,* 84 Cal.App. 2d 435, 440-441), has by section 4 of article I of its charter expressly and without exception limited the property tax rate to be levied upon property within the city to ''seventy-five (75) cents on every one hundred dollars, assessed valuation of such property.'' Such limited rate is not stated to be for ''general expenses'' or ''general purposes'' only, but is a clearly declared maximum property tax rate, which is not subject to general state law except as the charter may provide.[3] And it seems unequivocally clear that by providing, in subsection (j), section 2, article I, of the charter, that ''in the *procedure for the creation and issuance* of . . . bonded indebtedness the general law of the State . . . shall be observed and followed'' the city adopted at most only the rather detailed provisions as to procedure embodied in the Act of 1901 (see, e. g., §§ 2, 3, 5) to be followed in ''the creation and issuance of such . . . indebtedness'' and did not adopt section 7 of the act concerning the method of providing funds to pay the indebtedness *after* its creation and issuance, nor, more to the point at issue here, did the city authorize a tax levy for that purpose over and above the maximum rate expressly limited by its charter.

In support of my view that the tax limitation expressly declared in the charter must be observed, are *San Christina etc. Co.* v. *San Francisco* (1914), 167 Cal. 762 [141 P. 384, 52 L.R.A.N.S. 676] ; *Burr* v. *San Francisco* (1921), 186 Cal. 508 [199 P. 1034, 17 A.L.R. 581] ; and *Spreckels* v. *San Francisco* (1926), 76 Cal.App. 267, 276 [244 P. 919], which treated of the ''great necessity or emergency'' which, under certain terms of the charter of the city and county of San Francisco, would warrant the supervisors in temporarily suspending the otherwise controlling ''dollar limit'' of taxation specified in the charter. In the San Christina case the court declared (p. 774 of 167 Cal.) that ''no argument of hardship or inconvenience will justify a court in setting at naught the written terms of a city's charter, even at the instance of the city's officials. As was said by this court in *Connelly* v. *City of*

---

[3] See *Rothschild* v. *Bantel* (1907), 152 Cal. 5 [91 P. 803], to the effect that charter provisions control manner and place of safekeeping municipal funds, rather than a state statute adopted by the Legislature under the provisions of section 16½ of article XI of the California Constitution.

*San Francisco* [1912], 164 Cal. 101, [127 P. 834], 'an inconvenience to the city does not justify the despoiling of its taxpayers.' If these large revenues sought to be raised by the city do not fairly come within the purview of the emergency tax measure it is for the city to meet the desired end either by the issuance of bonds or by an amendment of its charter. It is not for the courts themselves to amend this charter by striking therefrom any of its salutary and protective provisions.'' (See, also, *Corbett* v. *City of Portland* (1897), 31 Ore. 407 [48 P. 428, 430].) In the Burr case it was held that an increase in city expenses, also urged by the city of Grass Valley in the instant case as a reason for ignoring the charter tax limitation, was not such an emergency as to authorize levy of a tax beyond the dollar limit. In so holding the court declared (pp. 515-516 of 186 Cal.) that a contrary holding would ''practically destroy'' the dollar limit, and that ''If the growth of the city, or changes in the charter, or in the state law, or the entering upon new activities by the city government, or other changes which are always to be expected in a growing community, require the creation of new offices, bureaus, or commissions and the hiring of more employees and result in large additions to the regular yearly running expenses of the city, and there is no corresponding increase in the tax valuation, and these things are sufficient to create the 'great necessity' in mind when the charter was adopted in 1899, then, of course, they will continue to operate every year and the dollar limit ceases to exist. It reduces the meaning of the charter provisions on the subject to a mere statement that such tax shall not exceed the dollar rate, except in cases where that rate will not raise the expenses of the city, in which event the rate will be unlimited. The charter may as well have provided that such taxes should not exceed the dollar limit, unless a higher rate was necessary to raise the money required to pay the regular annual expenses of the city. The *temporary* suspension authorized to 'enable the supervisors to provide for such necessity or emergency' would immediately become regular and permanent. The restriction to the dollar limit, which was intended to compel reasonable economy, would have no effect of that kind whatever. All that the supervisors need do to circumvent the provision would be to create a necessity by their own extravagance or by engaging in new municipal activities and enterprises, benevolent or otherwise, and the power to levy the increased rate would automatically follow.

"We think the charter-makers did not intend that the dollar limit should be so ineffectual and useless."

In the Spreckels case (1926), *supra,* 76 Cal.App. 267, 276, the continuance of sanitary measures to prevent recurrence of bubonic plague in San Francisco was held not such an emergency as would authorize suspension of the dollar limit and the court reiterated that "no argument of hardship or inconvenience will justify a court in ignoring . . . [the charter's] protective provisions."

Courts of other jurisdictions have also expressed views in conformity with those I here declare. In *Webber* v. *Traubel* (1880), 95 Ill. 427, 431, it was held that a charter provision expressly limiting the annual tax to "one percentum per annum," controlled over another charter provision which "enjoins the duty of providing, by taxation, to meet certain registered indebtedness, limiting the taxation in that regard to three mills on the dollar," and that the aggregate tax for "all purposes," including such three mills, could be only 1 per cent. In *Gould* v. *City of Paris* (1887), 68 Tex. 511 [4 S.W. 650], it was held that under a provision of the state constitution limiting the city to an annual tax of one-fourth of 1 per cent "to defray the current expenses of . . . local government," the city could not levy an additional tax of one-tenth of 1 per cent to provide for the interest and sinking fund on bonds issued for the purchase of fire-fighting equipment. In so holding the court declared (p. 652 of 4 S.W.), "It is a principle of law, sustained by the highest authority, that when a municipal corporation contracts a debt to be paid by taxation, if it has not the power to levy the tax, the debt cannot be enforced against it. 'The right to contract must be limited by the right to tax; and if, in the given case, no tax can lawfully be levied to pay the debt, the contract itself is void for want of authority to make it . . . The validity of a contract which can only be enforced by a resort to taxation depends on the power to levy the tax for that purpose.' [Citation.]" (See, also, *Corbett* v. *City of Portland* (Ore., 1897), *supra,* 48 P. 428; *State* v. *L'Engle* (1898), 40 Fla. 392 [24 So. 539]; *Brown* v. *Town of Patrick* (1943), 202 S.C. 236 [24 S.E.2d 365].)

Petitioner city also seeks to find support in the rule of contemporaneous and practical construction of the charter provisions and points to the fact that a "special tax separate and distinct from and in excess of the general City tax" was levied in the years 1924 through 1948 to meet the street improvement bonds authorized by the election of 1923. As repeatedly em-

phasized by the courts of this state, however, contemporaneous and practical construction of a statute can ''only be resorted to in order to clear up uncertainties and ambiguities. [Citations.] The construction of a statute by [those administering it] . . . cannot change its clear language or alter its plain meaning. [Citations.] The provisions of the charter in question not being uncertain, there is no opportunity for practical construction here.'' (*Montgomery* v. *Board of Administration* (1929), 34 Cal.App.2d 514, 521-522 [93 P.2d 1046, 94 P.2d 610]; see, also, *Johnston* v. *Board of Supervisors* (1947), 31 Cal.2d 66, 75 [187 P.2d 686]; *California Drive-In Restaurant Assn.* v. *Clark* (1943), 22 Cal.2d 287, 294 [140 P.2d 657, 147 A.L.R. 1028].) An ''erroneous administrative construction does not become decisive no matter how long continued.'' (*Trabue Pittman Corp.* v. *County of Los Angeles* (1946), 29 Cal.2d 385, 399 [175 P.2d 512].)

It is apparent that, as urged by respondent auditor, section 4 of article I of the charter of the city declares in plain and unequivocal language the intent to limit the city's property tax rate for all purposes to 75 cents, and that it is not the function of the courts to declare exceptions which are neither expressly nor even impliedly permitted by the charter. As already noted, if the people wish to increase the limit or provide exceptions, they may do so by expressly amending their charter by their own vote; there is nothing so iniquitous in the charter provision limiting the tax rate on property as to justify this court in effecting such amendment by what is known as ''judicial legislation.'' (See *Montgomery* v. *Board of Administration* (1939), *supra.*) It may also be added that it is a matter of public knowledge that municipalities may secure their revenues from sources other than property taxes and may, for instance, levy sales taxes and license taxes, among others, for such purpose (see *West Coast Advertising Co.* v. *San Francisco* (1939), *supra,* 14 Cal.2d 516, 524), especially where, as here, such taxes are expressly authorized in the city charter (art. I, § 2, subd. (i)).

For the reasons above stated, the writ sought should be denied.

EDMONDS, J.—I read the provisions of the city charter with the same meaning as that stated by Justice Schauer. I would also deny the city any relief in this proceeding for the additional reason that, by the judgment in an action to which

only the city and its auditor are parties, the property owners of Grass Valley have a tax burden placed upon them. In my opinion, litigation in that form is against the public interest and should not be entertained by this court. (See my dissenting opinions in *City of Whittier* v. *Dixon*, 24 Cal.2d 664 [151 P.2d 5, 153 A.L.R. 956], and cases cited.)